772 P.2d 191

STATE of Idaho, Plaintiff-respondent,

v.

Robert L. GILES, Defendant-appellant.

No. 17034.

Supreme Court of Idaho.

March 30, 1989.

Alan E. Trimming, Ada County Public Defender, Boise, for defendant-appellant. Deputy Public Defender Richard D. Toothman argued.

Jim Jones, Atty. Gen., Boise, for plaintiff-respondent. Myrna A.I. Stahman, Deputy Atty. Gen., argued.

BAKES, Justice.

Defendant Robert L. Giles (Giles) appeals his conviction on the second of two counts of lewd conduct with minor children under the age of sixteen years. Giles was jointly charged with Laura Lee Wright who was also convicted for the same crimes which were jointly committed against her two daughters, aged 5½ (older daughter) and 2½ (younger daughter) when the crimes were charged. Giles and Wright were jointly tried and convicted by the same jury. The defendant Giles filed a separate appeal with regard to his conviction of lewd conduct with the younger daughter. We affirm.

The older daughter was born April 1, 1981, to Laura Wright and Louis Wright, who separated from one another on Sep-

tember 22, 1982. Her parents reached an informal agreement whereby each parent would have custody of their daughter for consecutive 6-month periods. The younger daughter was born April 4, 1984, to Laura Wright and the defendant Robert Giles. She was living with them at the time the lewd conduct was committed.

On October 7, 1986, Louis Wright took custody of the older daughter pursuant to the agreement. On November 8, 1986, the older daughter revealed to Cynthia Goodman, Louis Wright's girlfriend, that she had been sexually abused by her mother and Giles. The older daughter also stated that her younger half-sister had been sexually abused as well.[1] The following day, November 9, 1986, Goodman reported the sexual abuse of the two girls to the police. Examinations of the older daughter that day by three doctors revealed an abrasion near the vaginal opening, no evidence of a hymenal ring, a fairly large bruise on the left upper leg and a slightly larger vaginal opening than would be expected for a girl her age. One of the three, Dr. Jambura, a pediatrician with extensive experience in child abuse cases, testified that it was "highly possible that vaginal penetration had been occurring on a relatively regular basis."

That same day, the younger daughter was taken from her mother and Giles and into custody by a police officer and a social worker. The next day, Dr. Jambura examined the younger daughter. His examination revealed some redness and bruises in the early stages of healing on the inner surface of the labium majora and the labium minora and some scarring on the back portion of the vagina. The healing area around the vagina was inflamed and swollen. Dr. Jambura explained that it is very difficult to bruise the labium minora and the bruising on the surfaces of both labia suggested that forcible contact was made with the inner genital area. He testified that these injuries were "strongly suggestive of sexual abuse with vaginal contact."

1. At trial, held May 6–12, 1987, the older daughter testified that Giles had intercourse with the younger sister while Laura held the younger sister's legs and covered her mouth so she wouldn't scream.

Dr. Jambura believed the trauma occurred approximately 2–3 days prior to the examination.

During Dr. Jambura's examination of the younger daughter, the two engaged in conversation. Over defense objection, Dr. Jambura testified at trial regarding this conversation:

A. [By Dr. Jambura] ... She started to carry on a very relaxed animated conversation. I then proceeded to just gently start asking questions about, "Well, how are things at home," you know, those sorts. Gently moving into the domestic situation and then moved into four questions in particular, as I reflected in my records, "Do you play with daddy? Does Daddy play with you? Does daddy touch you with his pee-pee? Do you touch his pee-pee?" And again we then established what was meant by pee-pee, it was a generic term for genital area.

Q. [By the prosecutor] Before you get into that, what was, as best you recollect, what was her response to the question "Do you play with daddy?"

A. Yes, we play—I remember her making a comment about yes we play a lot and expanding on that and talking about spending time with daddy.

Q. And "Does daddy play with you?" Was there any response?

A. She responded to that as well, that they played together in a variety of circumstances and, you know, seemed very unaffected by the question.

Q. And then what did you say and her response?

A. When I asked her "Does daddy touch you with his pee-pee," she did admit to that. When I asked, "Do you touch his pee-pee," she did not have any response.

Q. Excuse me. Did you notice any change in her affect or attitude in that line of questioning?

A. Yes.

Q. What did you observe?

A. She would not—oh, she did not talk any further about that. She would not elucidate what exactly—what kind of touching was taking place, or how it was

happening. She did, however, say that daddy does do this with me, but he does it a lot more with my sister than with me.

Q. And how did she offer that last statement? Was that in response to a question or was that just a volunteered statement?

A. That was a volunteered statement as I sat and waited for her to respond, again after she sort of clammed-up, and that was the next statement that she made after just allowing some silence to occur.

Giles raises one issue on appeal: whether the trial court properly allowed Dr. Jambura to testify concerning the out-of-court statements made to him by the younger daughter.

We first note that the trial court conducted a *voir dire* examination of the younger daughter to determine whether she was capable of communicating to the jury. He determined that she was not and counsel agreed.

■ We recently decided a case with unfortunate similarity to this case. In *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988), we held that hearsay statements of a three-year-old sexual abuse victim were properly admitted under the hearsay exception contained in I.R.E. 803(24), concluding that the trial court's admission of such a statement was a proper exercise of discretion where the court had considered all of the factors set out in I.R.E. 803(24). We held:

To be admissible under I.R.E. 803(24), the court must determine that (A) the statement has circumstantial guarantees of trustworthiness equivalent to those in Rules 803(1) to 803(23), (B) the statement is offered as evidence of a material fact, (C) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts, and (D) the general purposes of the rules of evidence, and the interests of justice, will best be served by admission of the statement into evidence. Further, (E) a state-

ment may not be admitted under I.R.E. 803(24) unless its proponent gives the adverse party adequate notice and information regarding use of the statement. Once these elements are met, the I.R.E. 803(24) exception is equally as valid as any other hearsay exception, such as the universally accepted present sense impression and the excited utterance exceptions, etc.

114 Idaho at 697, 760 P.2d at 36. As our prior cases hold, the trial court's ruling admitting such evidence will not be reversed on appeal absent a showing that the court abused its discretion. *State v. Terry,* 98 Idaho 285, 561 P.2d 1318 (1977); *State v. Thomas,* 94 Idaho 430, 489 P.2d 1310 (1971).

■ As was the case in *Hester,* the trial court here did not abuse its discretion because all the requirements were met. All of the I.R.E. 803(24) requirements were addressed by the trial court in determining the admissibility of the hearsay evidence. The trial court evaluated the hearsay statements for relevancy, need and reliability. *Hester,* 114 Idaho 688, 760 P.2d 27 (1988). The trial court's analysis here focused primarily on what appears to be the main source of contention surrounding the statements, *i.e.,* their reliability. Besides arguing that the statements should be inadmissible because the younger daughter could not testify, appellant directed his challenge to an attack on the statements' reliability. As indicia of unreliability, appellant cites the alleged suggestiveness of Dr. Jambura's questions (by referring to "daddy") and the younger daughter's alleged inability to recollect and communicate because of her age. Appellant attempts to distinguish between indicia of reliability and corroborative evidence, and suggests that the latter should not be considered in an I.R.E. 803(24) analysis. However, we said in *Hester* that for a statement "to be admissible under I.R.E. 803(24), the court must determine that ... the statement has *circumstantial* guarantees of trustworthiness ...," and that "the statement is more probative on the point for which it is offered than *any other evidence* which the proponent can procure through reasonable ef-

forts...." 114 Idaho at 697, 760 P.2d at 36 (emphasis added). The analysis required by I.R.E. 803(24) and *Hester* contemplates that the trial court will look at all the other evidence to determine whether it tends to corroborate the hearsay statement, before the trial court concludes that the hearsay statement has the same circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions.

■ Appellant does not claim to have been denied adequate notice and information regarding use of the younger daughter's statements to Dr. Jambura. Nor does appellant suggest that the statements are not offered as evidence of the material fact that Giles sexually abused the younger daughter. Thus, there is no question but that the statements are relevant. As previously discussed, *ante* at 986, 772 P.2d at 193, the younger daughter was judged unable to communicate in a trial setting and was therefore unable to be a witness at trial. Consequently, the hearsay statements made to Dr. Jambura were "more probative on the point for which [they were] offered than any other evidence which the proponent [could] procure through reasonable efforts." I.R.E. 803(24)(B). Thus, there is a need for the statements.

■ The final step in the analysis concerns the statements' reliability. The trial court here weighed the indicia of unreliability cited by Giles—the alleged suggestiveness of Dr. Jambura's questions and the younger daughter's alleged inability to recollect or communicate—against significant indicia of reliability. The trial court stated:

In this case, of course, there is physical evidence to corroborate that sexual abuse occurred. It also would seem to be the case that there is no motive to make up a story of this nature in a child of these years. We're not talking about a pubescent youth who may fantasize. The nature of the statements themselves as to sexual abuse are such that they fall outside the general believability that a child could make them up or would make them up. This is simply not the type of

statement, I believe, that one would expect a child to fabricate.[1]

We come then to the identification itself. Are there any indicia of reliability as to identification? From the doctor's testimony it appears that the injuries testified to occurred at the time that the victim was in the custody of the Defendants. The [older daughter] has testified as to identification of perpetrators. Those— the identification of the perpetrators in this case are persons well known to the [younger daughter]. This is not a case in which a child is called upon to identify a stranger or a person with whom they would have no knowledge of their identity or ability to recollect and recall. Those factors are sufficient indicia of reliability to permit the admission of the statements.

Under these circumstances, the statements have circumstantial guarantees of trustworthiness equivalent to the other hearsay exceptions. Furthermore, the interests of justice and the general purposes of evidence were best served by admission of these statements.

Having found the statements sufficiently reliable, the trial court stated, "It's then up to the jury to determine if they [the statements] are sufficiently reliable to give weight to in their determinations...." Giles was still able, during his defense, to present a witness, Dr. Thurber, to attack the statements' reliability. He was also able to argue to the jury that they should not give weight to the statements. However, the jury concluded otherwise.

■ Accordingly, we conclude that the trial court did not err when it allowed Dr. Jambura to testify concerning the younger daughter's statements to him. *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988).

The conviction of defendant Giles is affirmed.

SHEPARD, C.J., and JOHNSON, J., concur.

JOHNSON, Justice, concurring specially.

I concur here because *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988) is controlling precedent. Although I dissented in *Hester*, it is now the law of this state, and I will follow it. I am unable to distinguish the facts of this case from those of *Hester* sufficiently to avoid its application as stare decisis.

*Hester* did not address the admissibility of hearsay under the Confrontation Clause. Giles has not raised the issue here. This issue has been raised in the companion case to this one, *State v. Wright*, S.Ct. No. 17033, that has been argued but not decided, and will be addressed there.

HUNTLEY, Justice, concurring in the result.

While I am totally in agreement that traditional rules of evidence must be relaxed or modified to accommodate admissibility of children's testimony and out-of-court statements in child abuse cases, I am disturbed that the majority lacks either the imagination or the will to formulate rules for minimum safeguards for the defendant.[3]

At minimum, the sessions should be video-taped and the examiner should not be permitted to use leading, suggestive and "closed-ended" questions. The procedure and the questioning herein were improper and erroneous.

---

2. We note, as an additional indicia of reliability, the absence of a custody battle over the younger daughter. Unsubstantiated accusations of sexual abuse sometimes arise when one parent seeks to terminate custodial rights of the other parent. The child's coached remarks may be sought for use as an evidentiary weapon by an unscrupulous parent. Testimony given under these circumstances may be unreliable and ruled inadmissible. Concern over such abuse is not present here,

however. The younger daughter was taken directly from the custody of both parents and was then examined by Dr. Jambura when the statements were made.

3. Unfortunately, Giles has not raised the confrontation clause requirements in this appeal and a majority of the Court are of the position that we cannot raise it on our own motion. See, 102 Harvard Law Review at 156.

## I.  TESTIMONY

The trial court permitted Dr. John Jambura, a pediatrician who conducted a physical examination of the younger Wright girl and asked her whether sexual abuse occurred between her and the two co-defendants, to testify concerning hearsay statements made to him by the younger Wright daughter.  This evidence was admitted over the defendants' objection.  The younger Wright daughter was three years old at the time of the trial and only two-and-one-half years old at the time of the out-of-court statements to Dr. Jambura.  She did not testify at trial.  After the judge conducted a voir dire examination of the child, he asked both counsel if they agreed that she was incompetent to testify and both agreed she was not competent.

Dr. Jambura examined and interviewed the younger daughter and was allowed to testify to her responses to four questions, his testimony being:

> .... "Do you play with daddy?  Does daddy play with you?  Does daddy touch you with his pee-pee?  Do you touch his pee-pee?"  And again we then established what was meant by pee-pee, it was a generic term for genital area.
> Q.  Before you get into that, what was, as best you recollect, what was her response to the question "Do you play with daddy?"
> A.  Yes, we play—I remember her making a comment about yes we play a lot and expanding on that and talking about spending time with daddy.
> Q.  And "Does daddy play with you?"  Was there any response?
> A.  She responded to that as well, that they played together in a variety of circumstances and, you know, seemed very unaffected by the question.
> Q.  And then what did you say and her response?
> A.  When I asked her "Does daddy touch you with his pee-pee," she did admit to that.  When I asked, "Do you touch his pee-pee," she did not have any response.

She allegedly then volunteered that her daddy "....  does do this with me, but he does it a lot more with my sister than with me."

The doctor's testimony was clearly hearsay and since his interview was conducted without any procedural safeguards to permit meaningful cross-examination or review as to the integrity of the interview procedure, it should not have been admitted for the reasons which follow.

## II.  HEARSAY

The trial court admitted these statements under Rule 803(24) I.R.E. which provides:

> Rule 803.  Hearsay exceptions; availability of declarant immaterial.—The following are not excluded by the hearsay rule, even though the declarant is available as a witness.
> ....
> (24) Other exceptions.  A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact;  (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts;  and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.  A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

The hearsay declaration of the younger Wright girl is inherently unreliable because of the combined effect of her tender years and the suggestive, inadequately reviewable interview technique applied by Dr. Jambura.[4]

---

4.  Because I address only the coincidence of the      fact of the hearsay declarant's youth and the

To assess the impact of Dr. Jambura's interview techniques, it is necessary to review some precepts of developmental psychology. Children's cognitive abilities do not merely increase quantitatively. They go through recognizable stages which have been recognized as qualitatively different. Childhood cognition is fundamentally different from thinking and recalling in adults. *See, e.g., J. Piaget, THE LANGUAGE AND THOUGHT OF THE CHILD.* (1926). Some authorities state that most of the development of accurate recall skills occurs between ages five and ten. Johnson & Foley, *Differentiating Fact from Fantasy: The Reliability of Children's Memory* 40 J.SOC.ISSUES 33, 34–36 (1984). Younger children have memories, but may lack the ability to recall and relate them. *Id.*; Loftus & Davies, *Distortions in the Memory of Children,* 40 J.SOC.ISSUES, 51, 54 (1984). Leading questions, such as those asked by Dr. Jambura, are tempting because they may serve to help a child recall. However, they are extremely dangerous as a means leading to admissible evidence at a criminal trial (as opposed to as an aid in therapy for the child) because of the nature of children's memory. Even adults' memory can be tainted to the point that their actual testimony is deemed too unreliable to be admitted without offense to due process. Examples include the tainted identification resulting from an unduly suggestive lineup or the effect of hypnosis. *Cf. State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984) (in determining question of admissibility of hypnotically induced testimony, circumstances surrounding hypnotic sessions should be examined in light of suggestive safeguards, and it should then be determined if, in the totality of circumstances, it appears that testimony proposed is sufficiently reliable to merit admission). The problem of tainted memory is much more severe in young children. *See e.g.,* Cohen & Harnick, *The Susceptibility of Child Witnesses to Suggestion,* 4 LAW & HUMAN BEHAVIOR 210 (1980).

The risk with young children is that they may be unable to distinguish between a memory of something which actually happened from a memory of something they imagine happening. *See e.g.* Johnson & Foley, *supra,* at 45. If an interview technique leads a child to imagine an event, the child's memory of that imagined event will be indistinguishable from memories of events which the child actually experienced. Loftus & Davies, *supra,* at 52–53. Once this tainting of memory has occurred, the problem is irremediable. That memory is, from then on, as real to the child as any other. This "confabulation" is precisely the problem with hypnotically enhanced memory discussed by this Court in *Iwakiri,* 106 Idaho 618, 682 P.2d 571. *See,* Loftus &

---

fact that the context of the declaration was an interview by a professional, I am not required to address the defendant's contention that this hearsay is rendered inherently unreliable by the district court's finding that the younger Wright girl was incompetent as a witness at trial. The defendant contended that the hearsay declaration of the younger Wright girl is also unreliable because of the effect of her incompetence as a witness. In reading cases from other jurisdictions one must bear in mind that competency rules vary. In Idaho, all that is required of witnesses is that they be capable both of receiving just impressions of the facts respecting which they are examined and of relating them truthfully. Rule 601(a) I.R.E. The trial court found the younger Wright girl to be incompetent to testify at trial. Defendant argues this necessarily entails a finding that she is incapable of receiving accurate impressions or of relating them. However, the fact of incompetency to testify at trial does not mean that spontaneous declarations made at or near the time of an incident or responses made in a properly conducted interview lack sufficient reliability to be admitted in evidence. *Cf. State v. Paster, 524 A.2d 587 (R.I.1987) (Declarations to a social worker, a doctor, and a counselor which implicated the victim's father were held inadmissible no matter what hearsay exception was relied upon, the court reasoned that statements made by an incompetent witness do not become more reliable when repeated by an adult in court. Nevertheless, the court left open the possibility that a young child's declarations may be admissible if their circumstances contain a guarantee of trustworthiness, such as spontaneous, excited statements made close in time to the acts complained of. 524 A.2d at 590.) Because of my analysis today, this argument is relevant only as a means of showing an aggravation of unreliability rather than as constituting a distinct, salient source of that unreliability as a matter of law.*

Davies, *supra,* at 65; Stafford, *The Child as a Witness,* 37 Wash.L.Rev. 303 at 309 (1962).

In addition to leading questions, other circumstances can lead to memory confabulation. A person the child perceives to have high status will more easily influence the child to accept suggestions. It is therefore critical that neither the interviewer nor anyone else present have preconceptions. Goodman & Hegelson, *Child Sexual Assault: Children's Memory & the Law,* 40 U.Miami L.Rev. 181, 187–97 (1985).

The research discussed in the literature cited above is consistent with the testimony of Dr. Thurber, an expert in child psychology who testified for the defendant at trial.

A. Well, children who have a mental age of five years and chronological age of five years would have difficulty distinguishing fantasy from reality. The work of John Piaget, the great Swiss Psychologist, indicates that children of five, on the average, are unable to distinguish things that they have thought about from things that they've actually encountered in a world of reality.

Children at the age of five years mentally have problems in retrieving memories, so memories that are once stored have— are not consolidated, so to speak, are placed in abstract conceptual categories. The information may be there, it's just hard to retrieve it or bring it forth. And for these reasons children of this age level are very prone to respond to such things as leading questions. A question that implies information that was not actually the world of reality may become part of memory of a child, believes that that information fully occurred in the world of reality.

What I'm saying is that a child who was five years eight months chronologically, but has a mental age 15 months or so below that, will have even more severe problems in terms of retrieving memories and prone to be influenced by leading questions, will have problems distinguishing imagery, what they think about from the actual outside world.

Q. Do I understand you to be saying then, Dr. Thurber, that—correct me if I'm wrong, that were I to discuss with a child a particular action and event of that age that the child had not, in fact, experienced and discussed at some length, and asked the child to repeat it, that a child may have trouble distinguishing whether that actually happened to them or whether they've heard about it?

A. That's correct. It's especially the case in events that imply action. So if you describe for a four or five-year-old child some kind of an action-related behavior on the part of other people, the child has particular problems in distinguishing the discussion, the information presented verbally, from an actual experience and may confuse the two. And this comes from a lot of recent research at New York University in regard to children and fantasy versus reality.

Q. Now, the child that confuses that what they've heard with what actually happened to them, and they recite what they've heard or report what they've heard, is that child lying in the normal sense that we understand it?

A. Absolutely not. Lying in the normal sense involves some kind of deception. To young children about the age of five on the average what is in their memory is true regardless of how that information got into the memory banks.

Q. If a child were to be reciting information that is true, even if it's not, in fact, happened something that they're heard and they've taken into their minds as being true, is that likely to affect how they react in the telling of it; their body positions, their outward acting, observations?

A. If a child is coming forth with what has been stored in memory, their nonverbal behaviors will be very consistent with that information. That is, they wouldn't be able to distinguish from what source the information was stored.

. . . .

Q. What are some of the pitfalls or dangers to be aware of to be sure that you're gathering accurate data from a child?

A. My first response is they are probably too numerous to mention. But, first and foremost, the examiner, the evaluator, the interrogator must be aware of personal biases and how those biases can be reflected in an interview situation. *The primary consideration would be not to ask what are termed closed-ended questions,* questions that can be asked—pardon me, questions that can be answered yes or no. It has been found that an interviewer's pre-existing assumptions and biases can be reflected in these questions and can guide children into the responses that the interviewer wants to see.

So we ask open ended questions, questions that cannot be answered yes or no. It has also been found that interviewers can very subtly reward the responses they want to see, and can shape the answers of children. One of my colleagues in the Portland area, Bill McGeiver has found that simply by nodding the head and saying "um-hum" he can shape, so to speak, gradually shape behaviors in young children that border on the sexually bizarre, and these are children who have had no sexual abuse in their background. Now these are also very young children, I might mention, from the four to six-year-old range.

So, an interviewer must be very, very aware that very subtle cues such as a nod or saying "um-hum" can reward young children, in effect, and can shape and determine the responses that the interviewer is going to see.

Attention, as such, is also a very important factor. If an interviewer has decided that a child has been sexually abused, for example, that interviewer will likely attend when the child responds in a way that is consistent with the assumptions; and will not attend if the child responds in a way that is contrary to the pre-existing assumption.

So, I think of the important issues here, the key ones are open ended questions, be aware of pre-existing biases, do not respond in subtle ways that might reward the responses that you want to see. We could go on and on. There are multitudinous problems in interviewing children.

One of my colleagues who—from whom I received training at the University of Oklahoma Medical School has recently published a book on the investigation and treatment of child abuse, and is probably the nation's authority at this time, C. Eugene Walker, and his position is that in initially approaching a child that presumably has been abused, that you use a very nonstructured kind of situation. You don't even ask questions. Bring the child in a room with many toys, many writing implements, papers. Let the child just behave spontaneously and see what comes of this kind of a situation without attempting to prompt or influence the child by questions. And I would strongly support that approach because of the many possibilities of bias in terms of our questions.

Q. That sounds like a difficult task then to be certain not to inject anything into the interview.

A. Very much so.

Q. How can one guard—the best techniques for guarding against that so we can go back and determine whether an interviewer has skewed the information or injected their own feelings?

A. *One consistent recommendation in the sexual abuse area is that on the initial interview by a professional, that the interview session itself be video taped. Thus other professionals independently can evaluate the quality of the interview techniques. That's the only way.*

Q. Is an audio tape valuable?

A. In lieu of, or as a substitute for the video tape?

Q. Of course that won't reflect the non-vocal—

A. Correct. That would be the problem with it. So video tape is always recommended.

Q. Let's talk about interviewing in one other way. Assume, if you would, please, this scenario: *Pediatrician interviewing two-year-old child with the following questions: "Do you play with*

*daddy? Does daddy play with you? Do you ever touch daddy's pee-pee? Does daddy ever touch his pee-pee with you?"*

*How would you characterize that interview and those questions in terms of good procedure,* responsible procedure that anyone should rely on?

A. *All were closed-ended questions.* And an inference I would make here is that the pediatrician would be in his or her office, probably wearing a white coat, which is more likely to evoke an acquiescence response; that is the child will answer in the way that the interviewer wants to hear. (Emphasis supplied.)

All the dangerous circumstances testified to by Dr. Thurber and discussed in the literature were present in the interview of the younger Wright girl.

The circumstances surrounding this interview demonstrate dangers of unreliability which, because the interview was not recorded, can never be fully assessed. Dr. Jambura may well have had preconceptions. He knew that the older Wright girl was alleging that she had been sexually abused by Wright and Giles and, in fact, the younger Wright girl had been brought to him by the police for sexual abuse examination as a result of concern occasioned by the older girl's allegations. He did not video tape or even audio tape the interview. He lost or threw away the picture he worked with in communicating with the little girl about what he meant by "Daddy's pee-pee." By Dr. Jambura's own testimony, he asked questions which were leading, (e.g., "Does daddy touch you with his pee-pee?"). He made no accurate record, video, audio or otherwise of the younger Wright girls' responses; rather, he merely testified that she "admitted" the facts assumed in his leading question. Since there is no transcript or tape of this conversation, it remains unclear what Dr. Jambura is calling an "admission" that Daddy (Robert Giles) touched her with his "pee-pee." Whether she said "yes" or nodded agreeably is unclear. In any event, she did not elucidate or use her own words. By no means can one say that either the requisite

"circumstantial guarantees of trustworthiness" or "particularized guarantees of trustworthiness" for admissibility under Rule 803(24) I.R.E. and the Confrontation Clause, respectively, are present in this case. Where courts have admitted the hearsay declarations of child witnesses, statements were overwhelmingly found to be reliable only because they were excited utterances (Rule 803(2) I.R.E.) or part of the *res gestae.* The theory is that there was no time for fabrication, coaching or confabulation and, therefore, the guarantees of reliability shared by those traditional exceptions to the rule against admission of hearsay statements were present. Some examples of such admissible hearsay include: *People v. Ortega,* 672 P.2d 215 (Colo.App.1983) (excited utterance of a four year old); *Kilgore v. State,* 177 Ga.App. 656, 340 S.E.2d 640 (1986) (*res gestae,* declarations of three year old); *State v. Daniels,* 380 N.W.2d 777 (Minn.1986) (excited utterance concerning being locked in a room during a fire); *People v. Orduno,* 80 Cal.App.3d 738, 145 Cal.Rptr. 806 (1978) (spontaneous, exited utterance when first in mother's presence, right after being in defendant's presence); *Lancaster v. People,* 200 Colo. 448, 615 P.2d 720 (1980) (declaration made one and one-half hours after the sexual assault, as soon as declarant was in her mother's presence); *D.L.N. v. State,* 590 S.W.2d 820 (Tex.1979); *Bishop v. State,* 581 P.2d 45 (Okla.Cr.1978) ("He hurt me, he hurt me" immediately after incident). Conversely, courts examining admissibility of incompetent witnesses' declarations occurring appreciably after the incident generally exclude the declarations, as in the following cases: *Keefe v. State,* 50 Ariz. 293, 72 P.2d 425 (1937) (four year old made declaration to her parents five or six days after sodomy); *State v. Jalette,* 119 R.I. 614, 382 A.2d 526 (1978); *Brown v. State,* 344 So.2d 641 (Fla.App. 1977) (girl under fourteen made disclosure to her mother three days after lewd conduct); *State v. Lovely,* 110 Ariz. 219, 517 P.2d 81 (1973) (seven year old disclosed abuse to policeman two weeks after lewd conduct); *Scott v. State,* 131 Ga.App. 655, 206 S.E.2d 558 (1974). In *United States*

*v. Nick,* 604 F.2d 1199 (9th Cir.1979) the court ruled on two declarations. The mother picked the child up from the defendant-babysitter. She found her son with his pants unzipped in a locked bedroom with the defendant. At home she noticed "white stuff." The child described anal intercourse to her in child-like language while still in obvious distress. This *declaration to the mother was admissible,* including his identification of the defendant. The child's *later declaration identifying the defendant to a physician was not admissible.*

## III. CONFRONTATION

The sixth amendment to the United States Constitution provides in part that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const.Amend. VI. This provision is applicable to the states through the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965).

The purpose of the right of confrontation is to "advance 'the accuracy of the truth-determining process in criminal trials'" by allowing only reliable evidence to be admitted. *Tennessee v. Street,* 471 U.S. 409, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985), (quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970)). "The right to confront and cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056 at 2062, 90 L.Ed.2d 514 (1986).

The hearsay rules and the Confrontation Clause have similar policy objectives. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). However, they are not coextensive. Some out-of-court declarations which are admissible under hearsay exceptions may violate confrontation rights. *E.g., Green, supra,* 399 U.S. at 153–156, 90 S.Ct. at 1932–1933; *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

The Confrontation Clause objective of reliability is met by cross-examination, an opportunity for the jury to observe the witness' demeanor, and face-to-face confrontation between the witness and the accused. "[A] major reason underlying the constitutional confrontation right is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him." *Pointer v. Texas,* 380 U.S. 400 at 407–07, 85 S.Ct. 1065 at 1069–70. Concerning the opportunity for the jury to observe demeanor, the Supreme Court mentioned the importance of live testimony, when a witness stands "face to face with the jury in order that they may look at him, and judge, by his demeanor upon the stand and the manner in which he gives his testimony, whether he is worthy of belief." *Mattox v. United States,* 156 U.S. 237, 242–43, 15 S.Ct. 337, 339–40, 39 L.Ed. 409 (1895). The purpose of confrontation between an accuser and defendant is that it "undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and is present at trial." *Ohio v. Roberts,* 448 U.S. 56 at 63 n. 6, 100 S.Ct. 2531 at 2537 n. 6, 65 L.Ed.2d 597.

The impact of the Confrontation Clause upon the admissibility of hearsay is difficult to analyze. "Few tasks in criminal evidence are more perplexing than to describe the effect of the Confrontation Clause of the sixth amendment upon the hearsay doctrine." 4 LOUSELL & MUELLER, *FEDERAL EVIDENCE* § 418 at 123 (1970). Hearsay which falls into a well-established exception is usually, but not always, reliable enough to satisfy confrontation. Other hearsay, such as the declarations of the younger Wright girl admitted in the "catch-all" provision of Rule 803(24) I.R.E., should be considered "presumptively unreliable and inadmissible for Confrontation Clause purposes" absent a showing of "particularized guarantees of trustworthiness." *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986).

Only last year, the United States Supreme Court found that the sexual assault defendant's right to face-to-face confrontation was violated by permitting two 13-year-old girls to testify behind a large screen that enabled Coy to dimly perceive the witnesses but rendered them unable to

see him. *Coy v. Iowa,* — U.S. —, 108 S.Ct. 2798, 101 L.Ed.2d 857, 43 Cr.L. 3226 (1988). I fail to see how Wright's right to face-to-face confrontation escaped violation in this event of admission of hearsay testimony which did not fall within any of the traditional exceptions and which was brought into evidence through an interview lacking procedural safeguards.

## IV. INADMISSIBILITY

In summary, the hearsay declarations of the younger Wright girl were unreliable because of Dr. Jambura's interview technique: the questioning was not accurately recorded; the statements were not accurately recorded; and, blatantly leading questions were used in the interrogation. Further, this interrogation was performed by someone with a preconceived idea of what the child should be disclosing.

I would hold that all declarations of very young children in response to a professional's interrogation are *per se* inadmissible unless they are spontaneous, excited utterances or 1) such declarations are elicited by a competent professional, specifically trained in interviewing child victims and aware of the dangers of suggestibility disclosed in psychological research; *and,* 2) the entire interview is videotaped so the possibility of verbal and non-verbal suggestion can be evaluated later;[5] *and,* 3) the evidence establishes that the child's memory was not confabulated by previous improper interviews. The reader will note that such a ruling would be similar to portions of the standards embodied in Uniform Rules of Evidence Rule 807.[6]

---

**5.** Videotaping can protect defendants against erroneous convictions perhaps even more than can cross-examination at trial. If improper suggestion taints a child's memory, no amount of cross-examination of the child will reveal the error. This is because the child is not being deceitful. Because of the confabulation problem, the suggested memory is as real to the child as any other.

**6. Rule 807. Child Victims or Witnesses**

(a) A hearsay statement made by a minor who is under the age of [12] years at the time of trial describing an act of sexual conduct or physical violence performed by or with another on or with that minor or any [other individual] [parent, sibling or member of the familial household of the minor] is not excluded by the hearsay rule if, on motion of a party, the minor, or the court and following a hearing [in camera], the court finds that (i) there is a substantial likelihood that the minor will suffer severe emotional or psychological harm if required to testify in open court; (ii) the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthiness; (iii) the statement was accurately recorded by audio-visual means; (iv) the audio-visual record discloses the identity and at all times includes the images and voices of all individuals present during the interview of the minor; (v) the statement was not made in response to questioning calculated to lead the minor to make a particular statement or is clearly shown to be the minor's statement and not the product of improper suggestions; (vi) the individual conducting the interview of the minor is available at trial for examination or cross-examination by any party; and (vii) before the recording is offered into evidence, all parties are afforded an opportunity to view it and are furnished a copy of a written transcript of it.

(b) Before a statement may be admitted in evidence pursuant to subsection (a) in a criminal case, the court shall, at the request of the defendant, provide for further questioning of the minor in such manner as the court may direct. If the minor refuses to respond to further questioning or is otherwise unavailable, the statement made pursuant to subsection (a) is not admissible under this rule.

(c) The admission in evidence of a statement of a minor pursuant to subsection (a) does not preclude the court from permitting any party to call the minor as a witness if the interest of justice so require.

(d) In any proceeding in which a minor under the age of [12] years may be called as a witness to testify concerning an act of sexual conduct or physical violence performed by or with another on or with that minor or any [other individual] [parent, sibling or member of the familial household of the minor], if the court finds that there is a substantial likelihood that the minor will suffer severe emotional or psychological harm if required to testify in open court, the court may, on motion of a party, the minor or the court, order that the testimony of the minor be taken by deposition recorded by audio-visual means or by contemporaneous examination and cross-examination in another place under the supervision of the trial judge and communicated to the courtroom by closed-circuit television. Only the judge, the attorneys for the parties, the parties, individuals necessary to operate the equipment and any individual the court finds would contribute to the welfare and well-being of the minor may be present during the minor's testimony. If the court finds that placing the minor and one or more of the

In *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988), we concluded that the standards in Uniform Rule 807 were not applicable in the context of a child's hearsay statements to his *mother* in a bathroom setting. The situation presented in this case involves a professional engaged in the execution of interrogation specifically designed to elicit information to be utilized in a criminal proceeding. *Cf. United States v. Nick*, 604 F.2d 1199 (9th Cir.1979) (discussed *supra* in Part II of this opinion). While the situation presented in *Hester* is more closely akin to that involved in traditional exceptions to the hearsay rule, such as the excited utterance or *"res gestae"* exceptions discussed above, the present situation lacks such circumstantial guarantees of trustworthiness and, in fact, is inherently fraught with the dangers of unreliability which the rule against admission of hearsay evidence and the Confrontation Clause are designed to highlight and obviate.

## V. HARMLESS ERROR

The next question is whether admission of such evidence was harmless error. Rule 52, I.C.R., provides that "any error ... which does not affect substantial rights shall be disregarded." In determining whether an error has affected substantial rights or is harmless, the inquiry is "whether it appears from the record that the ... [error] contributed to the verdict, leaving the appellate court with a reasonable doubt that the jury would have reached the same result had the [error] not occurred." *State v. Palin*, 106 Idaho 70, 75, 675 P.2d 49, 54 (Ct.App.1983); *State v. Bussard*, 114 Idaho 781, 760 P.2d 1197, 1202 (Ct.App.1988). This test parallels the harmless error test applied in federal courts as stated in *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967) ("before a federal constitutional error can be held harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt.") (*Cited in Coy v. Iowa*, —— U.S. ——, 108 S.Ct. 2798, 2803, 101 L.Ed.2d 857 (1988).)

The existence of sexual abuse, the existence of the crime charged, was evidenced by Dr. Jambura's testimony regarding his medical examination of the younger Wright girl. Dr. Jambura's expert opinion was that she had injuries which were "strongly suggestive of sexual abuse with vaginal contact" which had occurred two to three days prior to the examination. Because of the severity of the injuries, Dr. Jambura could not ascertain whether chronic abuse had been occurring, yet he testified that there was scarring in the back portion of the vagina, that there was bruising of the labium minora, that the labium minora is very difficult to bruise, and that the bruising on the inner surfaces of both the labium majora and the labium minora suggested that forceful contact was made with the inner genital area.

The identity of the perpetrators was established by the older Wright girl's testimony at trial. The older Wright girl, who was six years old at the time of trial, testified that both she and her younger sister had been victimized by co-defendants Wright and Giles stating that Giles had intercourse with her younger sister while "[s]he [Laura] would be holding [the younger girl's] leg and holding her mouth so she wouldn't scream."

Applying the standard appropriate to determining whether an error has affected substantial rights or is harmless, it is apparent that admission of the pediatrician's declaration of the younger Wright daughter's hearsay statements was harmless error. I am convinced, beyond a reasonable

---

parties in the same room during the testimony of the minor would contribute to the likelihood that the minor will suffer severe emotional or psychological harm, the court shall order that the parties be situated so that they may observe and hear the testimony of the minor and may consult with their attorneys, but the court shall ensure that the minor

cannot see or hear them, except within the discretion of the court, for purposes of identification.

(e) The requirements for admissibility of a statement under this rule do not preclude admissibility of the statement under any other exception to the hearsay rule.

doubt, that the jury would have reached the same result had the error not occurred. The State introduced a plethora of admissible, inculpatory evidence. In reviewing the record, I conclude that the probative impact of the State's case—omitting the inadmissible hearsay testimony of Dr. Jambura—was so great that I am convinced the conviction would have obtained even if the inadmissible hearsay had not been admitted into evidence.

Accordingly, in the absence of the confrontation issue having been presented, I would affirm the conviction while providing the guidance for future interrogations as hereinabove set forth.

BISTLINE, Justice, dissenting.

Justice Huntley in his dissent conclusively demonstrates that the pediatrician's recitation of the child's testimony was inadmissable hearsay *and* violates the right to confront witnesses. The trial court found that the three year old child was INCOMPETENT TO TESTIFY AT TRIAL! How, then, could she have made "reliable" statements six months earlier to Dr. Jambura when she was only two and one-half years old?

It is necessary to go even farther than Justice Huntley. In cases like this the violation of the right to confront the alleged victim can never be harmless. A fundamental tenet of our criminal justice system guarantees the defendant the right to confront his or her accusers in open court through cross-examination. As the United States Supreme Court stated in *Davis v. Alaska:*

The Sixth Amendment to the Constitution guarantees the right of an accursed in a criminal prosecution 'to be confronted with the witnesses against him.' This right is secured for defendants in state as well as federal criminal proceedings under *Pointer v. Texas*, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923 (1965). Confrontation means more than being allowed to confront the witness physically. 'Our cases construing the [confrontation] clause hold that a primary interest secured by it is the right of cross-examina-

tion.' *Douglas v. Alabama*, 380 U.S. 415, 418, 85 S.Ct. 1074, 1076, 13 L.Ed.2d 934 (1965). Professor Wigmore stated:

'The main and essential purpose of confrontation is *to secure for the opponent the opportunity of cross-examination.* The opponent demands confrontation, not for the idle purpose of gazing upon the witness, or of being gazed upon by him, but for the purpose of cross-examination, which cannot be had except by the direct and personal putting of questions and obtaining immediate answers.' (Emphasis in original.) 5 J. Wigmore, Evidence § 1395, p. 123 (3d ed.1940).

Cross-examination is the principal means by which the believability of a witness and the truth of his testimony are tested.

415 U.S. 308, 315–16, 94 S.Ct. 1105, 1110, 39 L.Ed.2d 347 (1974).

In child abuse cases there are often "no witnesses except the victim." *Pennsylvania v. Richie*, 480 U.S. 39, 60, 107 S.Ct. 989, 1003, 94 L.Ed.2d 40 (1987). Without the opportunity to cross-examine such a witness, no trial can be fair, and consequently, no error can be harmless.