STATE

v.

**Howard G. PASTER.**

**Nos. 86–340–M.P., 86–460–Appeal.**

Supreme Court of Rhode Island.

April 23, 1987.

---

James E. O'Neil, Atty. Gen., Thomas Dickinson, Asst. Atty. Gen., for plaintiff.

Patrick McKinney, Wakefield, for defendant.

## OPINION

MURRAY, Justice.

In this criminal case the defendant, Howard G. Paster, appeals his conviction of second-degree sexual assault and we granted certiorari to the state to review the propriety of the defendant's sentence.

The defendant was charged with sexually assaulting his three-year-old daughter. At trial the state presented the testimony of defendant's former wife and seven-year-old son, as well as that of a counselor, a social worker, a doctor, and a policeman. The alleged victim did not testify because the trial justice had ruled her incompetent.

The defendant's former wife testified that after she left her husband, she did not want him to see their children. Nevertheless, defendant obtained visitation rights, and after defendant and she were divorced, the two children had regular, scheduled visits with their father. She testified that after several of these visits in early 1985, she became concerned about the children; changes in their demeanor and behavior led her to seek advice. In January she called the Department for Children and Their Families (DCF), the Child Abuse Hotline, and a doctor. In February she made several more calls to DCF. On March 14 defendant's former wife took her daughter to a health clinic because the daughter had a rash in her vaginal area. On March 24, the day of the children's last visit with their father, she spoke with a DCF worker about what she thought to be abuse by the father, and the worker recommended that she take the children to see a doctor. The next day she took the children to their pediatrician, who found nothing unusual. In late March she spoke with Mary Diebler, a counselor from the Women's Resource Center of South County. As a result of that conversation, Ms. Diebler visited defendant's former wife and the children at their home on April 2.

Ms. Diebler testified that as she was speaking with defendant's former wife on April 2, the children came into the room. Ms. Diebler said to the children, "I hear you're going to visit your father this weekend." The children responded by saying that they did not want to, and Ms. Diebler related damaging statements made to her by both children. The children's statements as related by Ms. Diebler indicated that both children were sexually abused by their father.

The seven-year-old son's testimony was confused and contradictory.

A social worker, Marion Kaufman, testified as to her interview of the two children on April 3, 1985. She said that the children demonstrated, through the use of anatomically correct dolls, that their father had penetrated his daughter. In Ms. Kaufman's opinion, sexual abuse had occurred.

Kevin Ettefagh, a doctor not board-certified in pediatrics, testified that his examination of the daughter on April 25, one month after her last visit with her father, revealed anal fissures and what appeared to be an enlarged vaginal opening. Doctor Ettefagh testified that these findings are consistent with sexual abuse, but that they could also result from other causes. He said that anal fissures in small children are most commonly caused by constipation and that though the vaginal opening appeared to him to be enlarged, he had not measured the opening and did not think the apparent enlargement conclusive proof of sexual abuse. Doctor Ettefagh also said that the little girl indicated to him that defendant had put his "thing" in or on her "behind" and in or on her "peepee."

Based on these witnesses' testimony and on other evidence, the jury convicted defendant of one count of second-degree sexual assault. The trial justice sentenced defendant to the custody of the warden of the Adult Correctional Institutions (ACI) for eight years, two years to be served at defendant's home, and the remaining six years suspended with probation for six years. The defendant was allowed to continue his employment, was ordered to undergo sexual counseling, and if defendant was ever allowed visitation of his children by the Family Court, that visitation was ordered to be in the company of a third person.

I

## DEFENDANT'S DAUGHTER'S ASSERTIONS

At a pretrial hearing the trial justice ruled defendant's daughter, then four years old, incompetent to testify. The trial justice was not convinced that the daughter could relate to the jury a capacity to observe, recollect, communicate or appreciate the necessity of telling the truth.

The trial justice did, however, allow into evidence statements made by the little girl, first through the testimony of Ms. Diebler and then through the testimony of Dr. Ettefagh. The trial justice also allowed in Ms. Kaufman's testimony as to the little girl's demonstrations using anatomical dolls.

The trial justice allowed verbal statements made by defendant's daughter to come in under two separate exceptions to the hearsay rule. The statements made to Mary Diebler were let in under the spontaneous-utterance exception. The statements made to Dr. Ettefagh were let in under the medical-records exception. The defendant argues that those statements were hearsay not within any exception and that, in any event, they were inadmissible because the little girl was ruled to be incompetent as a witness. The defendant also argues that Ms. Kaufman's testimony was inadmissible hearsay.

Hearsay is an out-of-court assertion offered for its truth. The assertion may be verbal or may be communicated through conduct.[1] Hearsay is generally inadmissible because such an assertion cannot be subjected to the truth-finding test of cross-examination. "The theory of the hearsay rule is that the many deficiencies, suppressions, sources of error and untrustworthiness, which lie underneath the bare untested assertion of a witness, may be best brought to light and exposed by the test of cross-examination." 5 Wigmore, *Evidence*, § 1362 at 3 (Chadbourn rev. 1974). Further, when hearsay is not admitted, the procedural safeguards of confrontation and of the sworn oath are not compromised. Exceptions to the hearsay rule exist only because of the inherent reliability of certain kinds of assertions.

---

1. In *In re Daniel*, 456 A.2d 258, 260 (R.I.1983), we found the conduct of a three-year-old in pointing to a photograph to be hearsay.

When a trial justice has ruled a witness incompetent to testify because the justice is not convinced that the witness is capable of relating a capacity to observe, to recollect, to communicate, or to appreciate truthfulness, the justice has already made the determination that the witness's assertions are unreliable. Though there may be instances in which a witness is competent at the time he or she makes an assertion and later, at the time of trial, due to the onset of senility or mental illness, is incompetent, such does not hold true with infants. If an infant is ruled incompetent at the time of trial because she is only four years old, assertions made by that infant a year earlier cannot be considered inherently more reliable. Logic dictates that, if anything, they are less reliable.

It is possible that there may exist situations in which, even though a child is incompetent, an earlier statement or instance of conduct by the child would be admissible because of its obvious spontaneous nature and direct temporal proximity to an exciting event. Such is not the situation here, however.

█ *The daughter's statements to Ms. Diebler.* In this case, defendant's daughter's statements to Ms. Diebler were made nine days after the daughter's last visit with her father. Many of these statements were made in response to questions asked by Ms. Diebler, and the statements cover six pages of transcript.

In *State v. Jalette,* 119 R.I. 614, 619–21, 382 A.2d 526, 529–30 (1978), also a case involving utterances by a daughter allegedly sexually assaulted by her father, we said that it is the state's burden to prove each utterance was a spontaneous verbal reaction to some startling or shocking event, made while the declarant was still in a state of nervous excitement produced by the event and made before the declarant had time to reflect, contrive, or misrepresent. Only when the circumstances surrounding the making of a statement *guarantee* the special trustworthiness of the statement will it be admitted. *Id.* In *Jalette* we found that a twenty-two-hour lapse between the time the daughter was alleg-

edly fondled and the time she reported the incident to her mother negated the spontaneity required for the statements to her mother to fall within the spontaneous-utterance exception.

Here, the daughter's statements to Ms. Diebler came after the daughter had been with her mother for nine days. During that nine days the mother, who had for some months suspected abuse, spoke with a DCF worker and took the children to see their pediatrician to have them checked for sexual abuse. These circumstances do not present the circumstantial guarantee of special trustworthiness we require to admit such statements over a hearsay objection. The state has not met its burden of proving that these statements were made before the declarant had time to reflect, contrive, or misrepresent. It has not shown that the daughter could not have been coached by the already suspecting mother during the nine days they were together.

In *Ketcham v. State,* 240 Ind. 107, 162 N.E.2d 247 (1959), statements made by a five-year-old girl to her mother after an alleged sexual attack by the defendant were not allowed into evidence through the mother as spontaneous utterances. The *Ketcham* court said:

"If the small child could tell the story to her mother, she could have told it on the witness stand to the jury, where it could [have been] subjected to the usual test of credibility. It is no answer to say she was too young to be a witness. If such be true, then the credibility of such testimony was not enhanced by having it presented second-handed to the jury by another person." *Id.* at 113, 162 N.E.2d at 250.

On the facts before us, we are persuaded by the *Ketcham* court's rationale. The lack of a circumstantial guarantee of special trustworthiness, the distance in time from the exciting event, and the responsive nature of the statements are factors which persuade us that, in this case, defendant's right to confront and cross-examine his accuser was paramount over the admission of the kind of hearsay offered against him.

█ *The daughter's statements to Dr. Ettefagh.* By the same reasoning, the

daughter's statements to Dr. Ettefagh are also inadmissible. It does not matter that the statements were classified as a "medical exception" rather than as "spontaneous utterances." The statements were made a month after the child's last visit with her father and were responsive in nature. If the child could tell the story to the doctor, she could have told it on the witness stand to the jury.

We need not reach defendant's other contentions. We agree that all assertions by defendant's daughter were inadmissible once the trial justice had ruled the little girl incompetent, and because there is at least a reasonable possibility that this evidence could have influenced the jury in reaching its verdict, we must reverse. *Jalette*, 119 R.I. at 623, 382 A.2d at 530.

This court recognizes that with certain crimes the evidence is sometimes so concealed that it is nearly impossible to present enough legal evidence to sustain a conviction. Nonetheless, such instances do not warrant admitting statements by an incompetent witness untested by cross-examination into evidence where the liberty of one charged with a serious crime hangs in the balance. *See Ketcham*, 240 Ind. at 113–14, 162 N.E.2d at 250. As John Adams pointed out over two centuries ago, under our system of justice it is far better to have many guilty persons go free than to have one innocent person be wrongly convicted. 3 Legal Papers of John Adams, 242 (1965) (Adams's Argument for the Defense, *Rex v. Wemms*, Dec. 3–4, 1770).

## II

### SENTENCING

The state has petitioned this court to review the propriety of defendant's sentence. We now review that sentence, even though we reverse defendant's conviction, to provide guidance on the issue of "home sentencing" to the trial courts.

The trial justice sentenced defendant, among other things, to be committed to the custody of the warden of the ACI for eight years, the first two years to be served at home with the remaining six years suspended. The state contends that a sentence of home confinement is not authorized by the General Laws and that such a sentence can only exist if authorized by a comprehensive administrative plan. We disagree.

A trial justice, under G.L.1956 (1981 Reenactment) § 12–19–8,[2] has the power to place a defendant convicted of second-degree sexual assault on probation with or without a suspended sentence. Had the trial justice in this case specifically termed defendant's confinement to his home a "condition of probation," the sentence would have been proper, for the "terms and conditions" of probation are fixed by the trial court. *Id.*

The sentence defendant received was the functional equivalent of his being sentenced to six years in the ACI, sentence suspended, with eight year's probation. As one condition of probation, defendant was to be confined to his home for two years, subject to spot checks by various state authorities. There is nothing improper about such a condition of probation; it is within the trial justice's discretion to define the reasonable parameters of probation when sentencing an individual defendant.

The difficulty with the trial justice's sentence is that she failed to articulate the

**2.** General Laws 1956 (1981 Reenactment) § 12–19–8 states:

"Suspension of sentence and probation by superior or district court.—Except where the suspension of sentence shall otherwise be prohibited by law, whenever any defendant shall appear for sentence before the superior or district court, the court may impose a sentence and suspend the execution thereof, in whole or in part, or place the defendant on probation without the imposition of a suspended sentence. The suspension shall place the defendant on probation for such time and on such terms and conditions as the court may fix.

The period of probation, where no sentence is imposed or where sentence is entirely suspended, may be for any period up to the maximum time of sentence provided by applicable statutes. Where sentence is imposed and suspended in part, the term ordered to be served and the period of probation together shall not exceed the maximum time of sentence provided by applicable statutes."

home confinement as a condition of probation. She further failed to articulate that the responsibility for supervising defendant's home confinement falls on the probation department. Obviously the warden of the ACI is not a proper agent for such supervision.

In the future, home confinement must be termed a "condition of probation." A defendant cannot be sentenced to "imprisonment" in his or her own home because § 12-19-23 mandates that "[u]nless otherwise provided, every person * * * sentenced to imprisonment shall be sentenced to and imprisoned in the [ACI]." Though perhaps only a technical, semantic difference, a defendant's confinement in the home must be termed a condition of probation so as not to violate § 12-19-23.

We observe that where, as here, a trial justice makes the specific finding that a defendant does not pose a danger to the community and that the defendant's family would be deprived of the defendant's wage earnings were he or she incarcerated, social policy does not disfavor such alternative sentences as home confinement. Sentencing a nondangerous defendant to serve time in the ACI is obviously costly to the people of Rhode Island. Thousands of dollars of state funds are spent on incarceration costs for each year of sentence served. Home confinement reduces incarceration expenditures and is socially cost effective in other ways:

"[S]avings of a substantial nature would be realized by the community when the breadwinner is allowed to continue his employment, thereby preventing members of his family from becoming public welfare charges. Further, he would remain on the tax rolls. He would also be in a position to pay restitution or damages if appropriate. More difficult to measure but no less obvious, house detention would prevent the breakup of defendants' families and family networks, with consequent psychological and physical disruption that cause trauma, even to subsequent generations through his wife and children. The defendant's own traumatization in prison will also be avoided. This latter factor

over and above the punishment of deprivation of liberty, although not intended by the law's sanction is, unfortunately, a concomitant effect in our prisons today. Imprisonment returns a man to society with a scared psyche, unpaid debts and financial losses, a highly disrupted if not irreparably broken family; children who lose respect for their parent; no job, and a gap in his life history that is hard to explain when he seeks a new job." *United States v. Murphy,* 108 F.R.D. 437, 441 (E.D.N.Y.1985) (Appendix).

Since home confinement with carefully screened and closely monitored defendants has already proven effective in other jurisdictions (*see* Corbett and Fersch, *Home as Prison: The Use of House Arrest,* Federal Probation 13, 17 and nn. 16–20 (March 1985)), we see no reason why such sentences should be avoided in Rhode Island. Of course, home confinement should not be ordered in cases where probation without confinement is the usual sentence. It should be thought of as an alternative, for carefully screened defendants, to incarceration in the ACI.

The state's argument that such sentences can only exist under a comprehensive administrative plan is baseless. A trial justice does not abuse his or her discretion by sentencing a nondangerous defendant to home confinement as a condition of probation provided the trial justice incorporates a reasonable, practical plan for supervision and provides specific sanctions for violations of such supervision as part of the sentence. Further, the state has not pointed to any difficulties occurring during the first eight months of this defendant's sentence.

For these reasons the defendant's appeal is sustained and the judgment of conviction vacated. The state's petition is denied pro forma, and the case is remanded to the Superior Court for a new trial.