**In re NE–KIA S. et al.**

No. 88–448–A.

*Supreme Court of Rhode Island.*

Nov. 21, 1989.

Frank Iacona (C.A.S.A.) and Janet Gilligan, Dept. of Children and their Families, for plaintiff.

Richard Casparian, Public Defender and Barbara Hurst, Asst. Public Defender, for defendant.

## OPINION

FAY, Chief Justice.

This matter is before the Supreme Court on the appeal of the respondent-mother (mother) from a decree of the Family Court adjudging her four children abused and neglected and committing them to the care, custody, and control of the Department for Children and Their Families (DCF). We affirm the decree of the Family Court.

At trial, David Russo (Russo), a child-protective investigator for DCF, testified that on or about February 1, 1988, he received a call concerning possible child abuse and neglect at a residence at 379 Friendship Street, Providence. Upon arriving at the residence, Russo found four children; Ne-kia S., Michael S., Levi S., and Oshean S., ages five, four, three, and eighteen months, respectively. Also at the apartment was a woman named Lucy D. The children appeared dirty and smelled foul. Russo testified that the children were staying in a small room with their mother and that he observed a mattress on the floor and dirty clothes strewn about.

Russo told the children that he was from DCF, and he explained that he was at their home because the department was concerned about their well-being. Russo asked the children where their mother was. Ne-kia informed Russo that their mother had gone to get her welfare check, that she was supposed to be back, but that she did not think her mother would return. She explained that if her mother received her check, she would stay out to buy some crack. She said she had seen her mother smoke crack numerous times.

Russo observed some bruises on Michael's face, and he asked Ne-kia if she knew how he had gotten the bruises. She told Russo that her mother had hit Michael.

She said that her mother hit her and the other children on a daily basis with her hands or with a wooden stick with a curved piece of metal on the end of it, which was part of a table leg or a bed. She said that her mother hit the boys more than the girls because, according to her mother, "the boys are greedy little devils that want too much food."

Russo also spoke to Michael. He asked Michael how he had gotten the bruises on his face. Michael told Russo that his mother had choked him and punched him. He said that she did this all the time. Michael then went into the bedroom and retrieved a bedstick with a piece of metal on it.[1] He told Russo that this was the stick that his mother usually used to hit them. Michael asked Russo to take the stick with him so that his mother would not hit him with it anymore.

Russo then asked Levi whether he had any bruises. Levi took off his shirt and told Russo to look at his back. Russo observed bruises on his back. Levi told him that his mother had hit him with a stick. Levi also corroborated Ne-kia's statement that their mother hit them on almost a daily basis but that the boys got hit more than the girls.

Russo also met with Oshean. She was nonverbal and could not give him any information. Russo did not observe any bruises on her, but he noted that she was very dirty and foul smelling.

Russo then inquired into the children's eating habits. He was told that if their mother fed them, they would usually get cold cereal in the morning and, usually, nothing else until the next day, unless they asked someone else for food.

Russo also asked the children how often they bathed. They told him that they did not bathe, that they had not taken a bath since they had been at the house.[2] Russo observed that the bathtub was full of dirty clothes.

Russo then took the children to Rhode Island Hospital where they were examined by Dr. Margarita Bello, a pediatric resident. At the hearing, Dr. Bello testified that she received a history from the children similar in detail to what they had told Russo. She found no bruises on either Ne-kia or Oshean; both, however, were somewhat unkempt and dirty.

Michael also appeared dirty, Dr. Bello stated. Moreover, she observed bluish-brown bruises on the right side of his nose and cheek, and a bruise was also noted in the left shoulder area. She testified that these bruises had been sustained in the past day or two. Dr. Bello also examined Levi. She observed several black-and-blue fading bruises on his mid back, left upper leg, and right elbow. She noted that his personal hygiene was also poor.

Relying upon the history given to her by the children and upon her own examination, Dr. Bello concluded that child abuse and neglect were probable in regard to Michael and Levi and possible concerning Ne-kia and Oshean. Her recommendation regarding all four children was that further investigation was necessary in order to rule out child abuse. She filled out a physician's report of examination (PRE) to obtain a seventy-two-hour hold over the children and referred the case to DCF for further investigation.

On February 5, 1988, without further investigation, DCF filed four petitions alleging that Ne-kia, Michael, Levi, and Oshean were all physically abused children and sought to transfer the care, custody, and control of them from their mother to DCF.

At trial, in addition to the testimony by Russo and Dr. Bello, DCF attempted to present the testimony of Ne-kia and Michael in chambers. Ne-kia, although able to respond to the trial justice's preliminary questions about herself, revealed herself to be too scared to proceed. The trial justice

1. This stick was introduced into evidence at trial.

2. The family was sharing the apartment with another family. The woman who actually rent-

ed the apartment told Russo that the children and their mother had been staying there since the first of the year. This would mean that the children had been in the apartment for approximately one month.

subsequently ruled that he could not proceed to question her as it would not be in her best interest to subject her to anything further. He subsequently ruled her unavailable under the provisions of Rule 804 of the Rhode Island Rules of Evidence. He further ruled that she was presumed competent under Rule 601 of the Federal Rules of Evidence.

Michael was also questioned in chambers but was found to be incompetent to testify. His statements to Russo and to Dr. Bello were stricken from the record upon a motion by defendant. Ne-kia's statements were allowed to stand.

At trial the mother presented no witnesses in her defense, nor did she testify herself. After hearing all the testimony, the trial justice found:

"[The mother] in whose care the children were, who is responsible for the care of these children, has created or allowed to be created, substantial risk of physical injury to the children by her actions and that, as to the children [*sic*] Levi, that she inflicted or allowed to be inflicted, upon the child, physical injury including excessive corporal punishment. The Court also finds that the evidence indicated that these children are without proper parental care and supervision; and the mother failed to provide these children with a minimum degree of care, supervision, or guardianship in accordance with the provisions of Title 40, Chapter 11 of the General Laws of the State of Rhode Island."

The trial justice found all four children to be abused and committed them to the care, custody, and control of the director of DCF.

On appeal the mother argues that the trial justice erred in admitting the statements of the children to Dr. Bello and Russo because said statements constituted inadmissible hearsay. We disagree.

The statements at issue fall into three categories, those made by Michael to Dr. Bello, those made by Ne-kia to Russo and Dr. Bello, and those made by Levi to Russo and Dr. Bello.

At the outset we may dispose of the mother's challenge to the admissibility of the statements made by Michael because this issue is moot. At trial the mother moved to strike from the record all statements made by Michael to Dr. Bello. This motion was granted by the trial justice, and these statements were stricken. These statements were not relied upon by the trial justice in rendering his decision and are no longer pertinent to the present controversy. We may now turn to the statements made by Levi and Ne-kia.

■ We shall first address the statements made by the children to investigator Russo. We believe that these statements may be properly classified as spontaneous utterances admissible as competent evidence under Rule 803(2) of the Rhode Island Rules of Evidence.

Rule 803(2) provides that "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" is not excluded by the hearsay rule, even if the declarant is available as a witness.

In determining whether Ne-kia and Levi were "under the stress of excitement" when they made statements to Russo, we are not unmindful that there was a significant time lapse between the last alleged incident of abuse and the statements made to Russo by the children. However, in *State v. Nordstrom*, 104 R.I. 471, 476, 244 A.2d 837, 840 (1968), we stated that in determining spontaneity, "[w]e eschew any approach to this question which calls for a blind obedience to a clock and hour by hour count of the time that has transpired between the event and the declaration." We held, rather, that "[t]he crucial question is whether the trial justice is satisfied the declarant was still laboring under the stress of nervous excitement when * * * she spoke." *Id.* We have also held that each situation must be evaluated on a case-by-case basis. *State v. St. Jean*, 469 A.2d 736, 738 (R.I.1983).

Thus the question before us is whether, in light of the facts, the statements were spontaneous or impulsive or whether they

were the product of reflection and deliberation. The record indicates that it was Dr. Bello's opinion that the bruises she observed on Michael's face had been sustained in the past day or two. Michael had responded to Russo's presence by retrieving a bedstick from the bedroom and asking Russo to take it away so the children's mother would not hit them with it anymore. Furthermore, the children had told Russo that their mother hit them on a daily basis. In fact, Russo testified that this was the first thing Ne-kia told him. There was no reflection or deliberation involved.

These facts, combined with the recognition that the children had no one to turn to prior to Russo's arrival, lead us to believe that the statements were an instinctive outpouring resulting from an ongoing history of physical abuse. Therefore, the statements were admissible under Rule 803(2), the so-called excited-utterance exception to the hearsay rule. The fact that the statements were made in response to an inquiry does not render the excited-utterance doctrine inapplicable. *State v. Creighton*, 462 A.2d 980, 982 (R.I.1983).

■ We now turn to the statements made by Levi and Ne-kia to Dr. Bello. The record indicates that after interviewing the children at their home, Russo transported the children to Rhode Island Hospital where they were examined by Dr. Bello. It is arguable that by the time the children spoke with Dr. Bello they were no longer laboring "under the stress of excitement caused by the event or condition" as required by Rule 803(2). However, we need not address that issue because G.L.1956 (1981 Reenactment) § 14–1–69, as enacted by P.L.1985, ch. 381, § 1, provides a sufficient independent basis for the admission of these statements.

Section 14–1–69 permits the use of hearsay evidence in any custody and/or termination trial if the statement was made spontaneously within a reasonable time after the act is alleged to have occurred and the statement was made to someone the child would normally turn to for sympathy, protection, or advice.

Although the mother recognizes the existence of § 14–1–69, she argues that it should not apply in this case because Levi's and Ne-kia's statements were made neither spontaneously nor were they made to someone to whom a child would normally turn to for sympathy, protection, or advice.

In enacting § 14–1–69, the Legislature relaxed the standards of spontaneity and timeliness generally applicable to hearsay proffered under the excited-utterance exception to the hearsay rule (Rule 803(2)). In doing so, the Legislature, in effect, "created a new, relaxed excited-utterance exception * * * specifically designed for the young child-witness." *In re Jean Marie W.*, 559 A.2d 625, 631 (R.I.1989). In relaxing these standards, the Legislature replaced the requirement that the declarant be " 'laboring under the stress of nervous excitement' " with the requirement that the statement be " 'made to someone the child would normally turn to for sympathy, protection, or advice.' " *In re Deborah M.*, 544 A.2d 572, 574 (R.I.1988).

The mother argues, however, that the statements were not spontaneous because they were made in response to questions by Dr. Bello. This argument is without merit because it misconstrues the spontaneity requirement of § 14–1–69. Section 14–1–69 in no way requires that a statement must be initiated by the declarant in order to be spontaneous. Furthermore, as we have stated today and held previously, "[e]ven under the stricter standards of admissibility required by the excited-utterance exception to the hearsay rule [Rule 803(2) ], the fact that a statement was made in response to an inquiry does not render the statement inadmissible." *Jean Marie W.*, 559 A.2d at 631; *State v. Creighton*, 462 A.2d at 982.

The mother's next claim is that Dr. Bello is not someone to whom the children would normally turn to for sympathy, protection, or advice because she was previously unknown to the children. She argues that § 14–1–69 has never been applied to statements made by children to so-called strangers. We disagree.

The crucial requirement at issue here is that the person to whom the statement is

made must be someone the child would normally turn to for protection. The statute does not require that this person be previously known to the speaker. We realize that it is not often the case that a young child turns to a complete stranger for sympathy, protection, or advice. However, we believe that a physician occupies a position of trust even though he/she may be previously unknown to his/her patient. It is this position of trust that distinguishes him/her from the ordinary stranger. Accordingly, in *In re Thomas V.*, 540 A.2d 1027 (R.I.1988), we held that statements made by a two-and-one-half-year-old child to a previously unknown physician, who introduced himself as a doctor at the time of examination, were admissible under § 14–1–69 because the physician was someone the child would turn to for sympathy or advice. The facts of the instant case are sufficiently similar to support a determination that Dr. Bello is someone the children would turn to for sympathy, protection, or advice.

The mother also argues that this case is distinguishable from other cases in which we have validated the use of hearsay assertions under § 14–1–69 because those cases alleged sexual abuse rather than physical abuse. We are not unmindful of this distinction. However, the goal of the statute is to prevent child abuse and to attempt to alleviate the consequent emotional trauma that a child may experience by being forced to testify about abuse, particularly when the abuser is the victim's parent. In light of this fact, we are unable to say that in situations in which physical abuse alone is alleged, the resulting trauma to a child is to such a degree less than the trauma attendant to sexual abuse that § 14–1–69 should not apply.

Lastly the mother argues that our holding in *State v. Paster*, 524 A.2d 587 (R.I. 1987), should be applied in this case to bar the introduction of Levi's and Ne-kia's statements. *Paster* was a criminal case in which the defendant appealed his conviction of second-degree sexual assault. We held that the out-of-court statements of a three-year-old child to a social worker concerning her father's alleged sexual abuse were not admissible under the spontaneous-utterance exception to the hearsay rule because the statements were made nine days after the child's last visit with her father and the child was ruled incompetent to testify at trial.

Our ruling was based on the recognition that,

"[i]f an infant is ruled incompetent at the time of trial because she is only four years old, assertions made by that infant a year earlier cannot be considered inherently more reliable. Logic dictates that, if anything, they are less reliable." *Id.* at 590.

The mother contends that *Paster* should be applied to bar the introduction of Levi's statements because the trial justice found him to be incompetent to testify. She further claims that the trial justice erred in not finding Ne-kia incompetent also and that, therefore, her statements should be barred as well.

This argument is inapplicable to the statements made by the children to Dr. Bello, since these statements are admissible under § 14–1–69. Section 14–1–69 does not require that a child be found competent before her statement may be admitted into evidence. *In re Thomas V.*, 540 A.2d 1027 (R.I.1988).

In regard to the statements made by the children to Russo, it is necessary to point out that in *Paster* we recognized that,

"[i]t is possible that there may exist situations in which, even though a child is incompetent, an earlier statement or instance of conduct by the child would be admissible because of its obvious spontaneous nature and direct temporal proximity to an exciting event." *Paster*, 524 A.2d at 590.

We believe that we have one such situation before us today. In *Paster* we were concerned that the child may have been coached by her already suspicious mother during the nine days after the child's last visit with her father. Similar circumstances of unreliability are not present in this case.

Furthermore, our decision in *Paster* was based, in part, upon the defendant's Sixth Amendment right to confront witnesses before him. The present controversy is civil in nature; therefore, the Sixth Amendment is inapplicable.

For these reasons the mother's appeal is denied and dismissed, the decree of the Family Court granting termination of parental rights is hereby affirmed, and the papers of this case are remanded to the Family Court.