775 P.2d 1224

**STATE of Idaho Plaintiff-respondent,**

v.

**Laura Lee WRIGHT,
Defendant-appellant.**

No. 17033.

Supreme Court of Idaho.

June 13, 1989.

Rolf M. Kehne, Boise, for defendant-appellant.

Jim Jones, Atty. Gen., Boise, for plaintiff-respondent. Myrna A.I. Stahman, Deputy Atty. Gen., argued.

HUNTLEY, Justice.

Laura Lee Wright appeals her conviction on one count of lewd conduct with a minor under sixteen, felony, I.C. § 18–1508. Wright was jointly charged with Robert L. Giles who was also convicted on two counts

of lewd conduct with a minor for having jointly committed the stated crimes against her two daughters, aged 5½ (older daughter) and 2½ (younger daughter) when the crimes were charged. Wright was found to have held her daughters down to permit her co-defendant, Giles, to have sexual intercourse with each. Giles and Wright were jointly tried and convicted by the same jury. Wright was sentenced to twenty years, indeterminate, on each count, the terms to run concurrently.

Wright and Giles each filed a separate appeal seeking reversal of their conviction on the count charged with respect to the acts against the younger daughter. This Court filed an opinion in *State v. Giles*, 115 Idaho 984, 772 P.2d 191 (1989) wherein a majority affirmed Giles' conviction notwithstanding his argument that admission of Dr. Jambura's testimony violated the rule against hearsay. The majority opinion in *Giles* held that the same testimony challenged herein was correctly admitted into evidence under I.R.E. 803(24) pursuant to the authority of *State v. Hester*, 114 Idaho 688, 760 P.2d 27 (1988).[1] Unlike Wright, Giles did not raise the question of violation of the Confrontation Clause of the Constitution of the United States and the majority was of the opinion that this Court could not raise that issue on its own motion. The issue of error under the Confrontation Clause is appropriately raised in the instant case and we hold that the trial court erred in admitting this testimony in violation of the standards applicable to the Confrontation Clause of the United States Constitution.

## I.

### TESTIMONY

The trial court permitted Dr. John Jambura, a pediatrician who conducted a physical examination of the younger Wright girl and asked her whether sexual abuse occurred between her and the two co-defendants, to testify concerning hearsay statements made to him by the younger Wright daughter. This evidence was admitted over the defendants' objection. The younger Wright daughter was three years old at the time of the trial and only two-and-one-half years old at the time of the out-of-court statements to Dr. Jambura. She did not testify at trial. After the judge conducted a voir dire examination of the child, he asked both counsel if they agreed that she was not capable of communicating to the jury and both agreed she was not competent to testify.

Dr. Jambura examined and interviewed the younger daughter and was allowed to testify to her responses to four questions, his testimony being:

.... "Do you play with daddy? Does daddy play with you? Does daddy touch you with his pee-pee? Do you touch his pee-pee?" And again we then established what was meant by pee-pee, it was a generic term for genital area.

Q. Before you get into that, what was, as best you recollect, what was her response to the question "Do you play with daddy?"

A. Yes, we play—I remember her making a comment about yes we play a lot and expanding on that and talking about spending time with daddy.

Q. And "Does daddy play with you?" Was there any response?

A. She responded to that as well, that they played together in a variety of circumstances and, you know, seemed very unaffected by the question.

Q. And then what did you say and her response?

A. When I asked her "Does daddy touch you with his pee-pee," she did admit to that. When I asked, "Do you touch his pee-pee," she did not have any response.

She allegedly then volunteered that her daddy ".... does do this with me, but he does it a lot more with my sister than with me."

────────

1. The author continues to subscribe to the view articulated in his "concurrence in the result" in *Giles* with regard to the hearsay rule, but acknowledges that the majority view expressed in *Giles* is now the law of this state and is, therefore, controlling herein.

The trial court admitted these statements under Rule 803(24) I.R.E. which provides:

Rule 803. Hearsay exceptions; availability of declarant immaterial.—The following are not excluded by the hearsay rule, even though the declarant is available as a witness.

. . . .

(24) Other exceptions. A statement not specifically covered by any of the foregoing exceptions but having equivalent circumstantial guarantees of trustworthiness, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence. A statement may not be admitted under this exception unless the proponent of it makes known to the adverse party sufficiently in advance of the trial or hearing to provide the adverse party with a fair opportunity to prepare to meet it, the proponent's intention to offer the statement and the particulars of it, including the name and address of the declarant.

## II. CONFRONTATION

■ Wright argues that even if admission of the doctor's testimony was not erroneous under the rule against hearsay, it was, nonetheless, erroneous because it violated the dictates of the Confrontation Clause of the United States Constitution. The sixth amendment to the United States Constitution provides in part that "in all criminal prosecutions, the accused shall enjoy the right ... to be confronted with the witnesses against him." U.S. Const. Amend. VI. This provision is applicable to the states through the fourteenth amendment. *Pointer v. Texas,* 380 U.S. 400, 403, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965).

The purpose of the right of confrontation is to "advance 'the accuracy of the truth-determining process in criminal trials'" by allowing only reliable evidence to be admitted. *Tennessee v. Street,* 471 U.S. 409, 415, 105 S.Ct. 2078, 2082, 85 L.Ed.2d 425 (1985), (quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 219, 27 L.Ed.2d 213 (1970)). "The right to confront and cross-examine witnesses is primarily a functional right that promotes reliability in criminal trials." *Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 2062, 90 L.Ed.2d 514 (1986).

The Confrontation Clause objective of reliability is met by cross-examination, an opportunity for the jury to observe the witness' demeanor, and face-to-face confrontation between the witness and the accused. "[A] major reason underlying the constitutional confrontation rule is to give a defendant charged with a crime an opportunity to cross-examine the witnesses against him." *Pointer v. Texas,* 380 U.S. at 406–07, 85 S.Ct. at 1069–70. Concerning the opportunity for the jury to observe demeanor, the Supreme Court mentioned the importance of live testimony, when a witness stands "face to face with the jury in order that they may look at him, and judge by his demeanor upon the stand and the manner in which he gives his testimony whether he is worthy of belief." *Mattox v. United States,* 156 U.S. 237, 242–43 15 S.Ct. 337, 339, 39 L.Ed. 409 (1895). The purpose of confrontation between an accuser and defendant is that it "undoubtedly makes it more difficult to lie against someone, particularly if that person is an accused and is present at trial." *Ohio v. Roberts,* 448 U.S. 56, 63 n. 6, 100 S.Ct. 2531, 2538, n. 6, 65 L.Ed.2d 597 (1980). Only last year, the United States Supreme Court found that the sexual assault defendant's right to face-to-face confrontation was violated by permitting two 13–year–old girls to testify behind a large screen that enabled Coy to dimly perceive the witnesses but rendered them unable to see him. *Coy v. Iowa,* 487 U.S. 1012, 108 S.Ct. 2798, 101 L.Ed.2d 857 (1988).

■ The hearsay rules and the Confrontation Clause have similar policy objectives. *California v. Green,* 399 U.S. 149, 155, 90 S.Ct. 1930, 1933, 26 L.Ed.2d 489 (1970). However, they are not coextensive. Some out-of-court declarations which are admissi-

ble under hearsay exceptions may violate confrontation rights. *E.g., Green,* 399 U.S. at 153–156, 90 S.Ct. at 1932–34; *Bruton v. United States,* 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968). The impact of the Confrontation Clause upon the admissibility of hearsay is difficult to analyze. "Few tasks in criminal evidence are more perplexing than to describe the effect of the Confrontation Clause of the sixth amendment upon the hearsay doctrine." 4 LOUSELL & MUELLER, *FEDERAL EVIDENCE* § 418 at 123 (1970). *Hearsay which falls into a well-established exception is usually, but not always, reliable enough to satisfy confrontation. Other hearsay, such as the declarations of the younger Wright girl admitted in the "catch-all" provision of Rule 803(24) I.R.E., should be considered "presumptively unreliable and inadmissible for Confrontation Clause purposes" absent a "showing of particularized guarantees of trustworthiness." Lee v. Illinois,* 476 U.S. 530, 106 S.Ct. 2056, 2064, 90 L.Ed.2d 514 (1986). (Emphasis added.)

We fail to see how Wright's right to face-to-face confrontation escaped violation in this event of admission of inculpatory hearsay testimony which did not fall within any of the traditional exceptions and which was brought into evidence as a result of an interview lacking procedural safeguards. The record does not provide the required showing of particularized guarantees of trustworthiness supporting the doctor's statement of the young girl's declarations. Instead, the hearsay declarations of the younger Wright girl are not trustworthy because of Dr. Jambura's interview technique: the questions and answers were not recorded on videotape for preservation and perusal by the defense at or before trial; and, blatantly leading questions were used in the interrogation. Further, the statements lack trustworthiness because this interrogation was performed by someone with a preconceived idea of what the child should be disclosing. Because of the combined effect of her tender years and the suggestive, inadequately reviewable interview technique applied by Dr. Jambura, we conclude that Dr. Jambura's testimony regarding the younger Wright girl's declarations lacked the particularized guarantees of trustworthiness necessary to satisfy the requirements of the Confrontation Clause.

The doctor's interview was conducted without procedural safeguards sufficient to provide meaningful cross-examination or review as to its integrity. To assess the impact of Dr. Jambura's interview techniques, it is necessary to review some precepts of developmental psychology.

Children's cognitive abilities do not merely increase quantitatively. They go through recognizable stages which have been recognized as qualitatively different. Childhood cognition is fundamentally different from thinking and recalling in adults. *See, e.g.,* J. Piaget, THE LANGUAGE AND THOUGHT OF THE CHILD. (1926). Some authorities state that most of the development of accurate recall skills occurs between ages five and ten. Johnson & Foley, *Differentiating Fact from Fantasy: The Reliability of Children's Memory* 40 J. SOC. ISSUES 33, 34–36 (1984). Younger children have memories, but may lack the ability to recall and relate them. *Id.;* Loftus & Davies, *Distortions in the Memory of Children,* 40 J. SOC. ISSUES, 51, 54 (1984). Leading questions, such as those asked by Dr. Jambura, are tempting because they may serve to help a child recall. However, they are extremely dangerous as a means leading to admissible evidence at a criminal trial (as opposed to as an aid in therapy for the child) because of the nature of children's memory. Even adults' memory can be tainted to the point that their actual testimony is deemed too unreliable to be admitted *without offense to due process.* Examples include the tainted identification resulting from an unduly suggestive lineup or the effect of hypnosis. *Cf. State v. Iwakiri,* 106 Idaho 618, 682 P.2d 571 (1984) (in determining question of admissibility of hypnotically induced testimony, circumstances surrounding hypnotic sessions should be examined in light of suggestive safeguards, and it should then be determined if, in the totality of circumstances, it appears that testimony proposed is suffi-

ciently reliable to merit admission). The problem of tainted memory is much more severe in young children. *See e.g.,* Cohen & Harnick, *The Susceptibility of Child Witnesses to Suggestion,* 4 *LAW & HUMAN BEHAVIOR* 210 (1980).

The risk with young children is that they may be unable to distinguish between a memory of something which actually happened from a memory of something they imagine happening. *See e.g.* Johnson & Foley, *supra,* at 45. If an interview technique leads a child to imagine an event, the child's memory of that imagined event will be indistinguishable from memories of events which the child actually experienced. Loftus & Davies, *supra,* at 52–53. Once this tainting of memory has occurred, the problem is irremediable. That memory is, from then on, as real to the child as any other. This "confabulation" is precisely the problem with hypnotically enhanced memory discussed by this Court in *Iwakiri,* 106 Idaho 618, 682 P.2d 571. *See,* Loftus & Davies, *supra,* at 65; Stafford, *The Child as a Witness,* 37 Wash.L.Rev. 303 at 309 (1962).

In addition to leading questions, other circumstances can lead to memory confabulation. A person the child perceives to have high status will more easily influence the child to accept suggestions. It is therefore critical that neither the interviewer nor anyone else present have preconceptions. Goodman & Hegelson, *Child Sexual Assault: Children's Memory & the Law,* 40 U. Miami L.Rev. 181, 187–97 (1985).

The research discussed in the literature cited above is consistent with the testimony of Dr. Thurber, an expert in child psychology who testified for the defendant at trial.

A. Well, children who have a mental age of five years and chronological age of five years would have difficulty distinguishing fantasy from reality. The work of John Piaget, the great Swiss Psychologist, indicates that children of five, on the average, are unable to distinguish things that they have thought about from things that they've actually encountered in a world of reality.

Children at the age of five years mentally have problems in retrieving memories, so memories that are once stored have—are not consolidated, so to speak, are placed in abstract conceptual categories. The information may be there, it's just hard to retrieve it or bring it forth. And for these reasons children of this age level are very prone to respond to such things as leading questions. A question that implies information that was not actually the world of reality may become part of memory of a child, believes that that information fully occurred in the world of reality [sic].

What I'm saying is that a child who was five years eight months chronologically, but has a mental age 15 months or so below that, will have even more severe problems in terms of retrieving memories and prone to be influenced by leading questions, will have problems distinguishing imagery, what they think about from the actual outside world.

Q. Do I understand you to be saying then, Dr. Thurber, that—correct me if I'm wrong, that were I to discuss with a child a particular action and event of that age that the child had not, in fact, experienced and discussed at some length, and asked the child to repeat it, that a child may have trouble distinguishing whether that actually happened to them or whether they've heard about it?

A. That's correct. It's especially the case in events that imply action. So if you describe for a four or five-year-old child some kind of an action-related behavior on the part of other people, the child has particular problems in distinguishing the discussion, the information presented verbally, from an actual experience and may confuse the two. And this comes from a lot of recent research at New York University in regard to children and fantasy versus reality.

Q. Now, the child that confuses that what they've heard with what actually happened to them, and they recite what they've heard or report what they've heard, is that child lying in the normal sense that we understand it?

A. Absolutely not. Lying in the normal sense involves some kind of deception. To young children about the age of five on the average what is in their memory is true regardless of how that information got into the memory banks.

Q. If a child were to be reciting information that is true, even if it's not, in fact, happened something that they're heard and they've taken into their minds as being true, is that likely to affect how they react in the telling of it; their body positions, their outward acting, observations?

A. If a child is coming forth with what has been stored in memory, their nonverbal behaviors will be very consistent with that information. That is, they wouldn't be able to distinguish from what source the information was stored.

. . . .

Q. What are some of the pitfalls or dangers to be aware of to be sure that you're gathering accurate data from a child?

A. My first response is they are probably too numerous to mention. But, first and foremost, the examiner, the evaluator, the interrogator must be aware of personal biases and how those biases can be reflected in an interview situation. *The primary consideration would be not to ask what are termed closed-ended questions*, questions that can be asked—pardon me, questions that can be answered yes or no. It has been found that an interviewer's pre-existing assumptions and biases can be reflected in these questions and can guide children into the responses that the interviewer wants to see.

So we ask open ended questions, questions that cannot be answered yes or no. It has also been found that interviewers can very subtly reward the responses they want to see, and can shape the answers of children. One of my colleagues in the Portland area, Bill McGeiver has found that simply by nodding the head and saying "um-hum" he can shape, so to speak, gradually shape behaviors in young children that border on the sexually bizarre, and these are children who have had no sexual abuse in their background. Now these are also very young children, I might mention, from the four to six-year-old range.

So, an interviewer must be very, very aware that very subtle cues such as a nod or saying "um-hum" can reward young children, in effect, and can shape and determine the responses that the interviewer is going to see.

Attention, as such, is also a very important factor. If an interviewer has decided that a child has been sexually abused, for example, that interviewer will likely attend when the child responds in a way that is consistent with the assumptions, and will not attend if the child responds in a way that is contrary to the pre-existing assumption.

So, I think of the important issues here, the key ones are open ended questions, be aware of pre-existing biases, do not respond in subtle ways that might reward the responses that you want to see. We could go on and on. There are multitudinous problems in interviewing children.

One of my colleagues who—from whom I received training at the University of Oklahoma Medical School has recently published a book on the investigation and treatment of child abuse, and is probably the nation's authority at this time, C. Eugene Walker, and his position is that in initially approaching a child that presumably has been abused, that you use a very nonstructured kind of situation. You don't even ask questions. Bring the child in a room with many toys, many writing implements, papers. Let the child just behave spontaneously and see what comes of this kind of a situation without attempting to prompt or influence the child by questions. And I would strongly support that approach because of the many possibilities of bias in terms of our questions.

Q. That sounds like a difficult task then to be certain not to inject anything into the interview.

A. Very much so.

Q. How can one guard—the best techniques for guarding against that so we can go back and determine whether an inter-

viewer has skewed the information or injected their own feelings?

A. *One consistent recommendation in the sexual abuse area is that on the initial interview by a professional, that the interview session itself be video taped. Thus other professionals independently can evaluate the quality of the interview techniques. That's the only way.*

Q. Is an audio tape valuable?

A. In lieu of, or as a substitute for the video tape?

Q. Of course that won't reflect the nonvocal—

A. Correct. That would be the problem with it. So video tape is always recommended.

Q. Let's talk about interviewing in one other way. Assume, if you would, please, this scenario: *Pediatrician interviewing two-year-old child with the following questions: "Do you play with daddy? Does daddy play with you? Do you ever touch daddy's pee-pee? Does daddy ever touch his pee-pee with you?"*

*How would you characterize that interview and those questions in terms of good procedure,* responsible procedure that anyone should rely on?

A. *All were closed-ended questions.* And an inference I would make here is that the pediatrician would be in his or her office, probably wearing a white coat, which is more likely to evoke an acquiescence response; that is the child will answer in the way that the interviewer wants to hear. (Emphasis added.)

All the dangerous circumstances testified to by Dr. Thurber and discussed in the literature were present in the interview of the younger Wright girl.

The circumstances surrounding this interview demonstrate dangers of unreliability which, because the interview was not recorded, can never be fully assessed. Dr. Jambura may well have had preconceptions. He knew that the older Wright girl was alleging that she had been sexually abused by Wright and Giles and, in fact, the younger Wright girl had been brought to him by the police for sexual abuse examination as a result of concern occasioned by the older girl's allegations. He did not video tape or even audio tape the interview. He lost or threw away the picture he worked with in communicating with the little girl about what he meant by "Daddy's pee-pee." By Dr. Jambura's own testimony, he asked questions which were leading, (e.g., "Does daddy touch you with his pee-pee?"). He made no accurate record, video, audio or otherwise of the younger Wright girl's responses; rather, he merely testified that she "admitted" the facts assumed in his leading question. Since there is no transcript or tape of this conversation, it remains unclear what Dr. Jambura is calling an "admission" that Daddy (Robert Giles) touched her with his "pee-pee." Whether she said "yes" or nodded agreeably is unclear. In any event, she did not elucidate or use her own words.

By no means can one say that the "particularized guarantees of trustworthiness" required to withstand objection pursuant to the Confrontation Clause are demonstrable in this case. Where courts have admitted the hearsay declarations of child witnesses, statements were overwhelmingly found to be reliable only because they were excited utterances (Rule 803(2) I.R.E.) or part of the *res gestae.* The theory is that there was no time for fabrication, coaching or confabulation and, therefore, the guarantees of reliability shared by those traditional exceptions to the rule against admission of hearsay statements were present. Some examples of such admissible hearsay include: *People v. Ortega,* 672 P.2d 215 (Colo.App.1983) (excited utterance of a four year old); *Kilgore v. State,* 340 S.E.2d 640 (Ga.App.1986) (*res gestae,* declarations of three year old); *State v. Daniels,* 380 N.W.2d 777 (Minn.1986) (excited utterance concerning being locked in a room during a fire); *People v. Orduno,* 80 Cal.App.3d 738, 145 Cal.Rptr. 806 (1978) (spontaneous, excited utterance when first in mother's presence, right after being in defendant's presence); *Lancaster v. People,* 200 Colo. 448, 615 P.2d 720 (1980) (declaration made one-half hour after the sexual assault, as soon as declarant was in her mother's pres-

ence); *D.L.N. v. State*, 590 S.W.2d 820 (Tex.1979); *Bishop v. State*, 581 P.2d 45 (Okla.Cr.1978) ("He hurt me, he hurt me" immediately after incident). Conversely, courts examining admissibility of incompetent witnesses' declarations occurring appreciably after the incident generally exclude the declarations, as in the following cases: *Keefe v. State*, 50 Ariz. 293, 72 P.2d 425 (1937) (four year old made declaration to her parents several days after sodomy); *State v. Jalette*, 119 R.I. 614, 382 A.2d 526 (1978); *Brown v. State*, 344 So.2d 641 (Fla. App.1977) (girl under fourteen made disclosure to her mother three days after lewd conduct); *State v. Lovely*, 110 Ariz. 219, 517 P.2d 81 (1973) (seven year old disclosed abuse to policeman two weeks after lewd conduct); *Scott v. State*, 131 Ga.App. 655, 206 S.E.2d 558 (1974).

Dr. Jambura's testimony as presented lacks particularized guarantees of trustworthiness and, in fact, is fraught with the dangers of unreliability which the Confrontation Clause is designed to highlight and obviate. We are not convinced, beyond a reasonable doubt, that the jury would have reached the same result had the error not occurred.[2] Thus, we reverse Wright's conviction on the count charged with respect to the acts against the younger daughter because of the Confrontation Clause violation and remand the case for trial consistent herewith.

BISTLINE and JOHNSON, JJ., concur.

SHEPARD, J., sat but did not participate due to his untimely death.

BAKES, Chief Justice, dissenting:

The Court today reverses Wright's conviction because of an alleged violation of the right to confrontation under the sixth amendment to the United States Constitution. The majority opinion concludes that "Dr. Jambura's testimony as presented lacks particularized guarantees of trustworthiness and, in fact, is fraught with the dangers of unreliability which the Confron-

tation Clause is designed to highlight and obviate." 116 Idaho at 389, 775 P.2d at 1231. The majority reaches this conclusion after conducting an analysis totally unlike any confrontation clause analysis previously used by any court, particularly the United States Supreme Court. As I deduce from the opinion's analysis, from now on all hearsay statements by very young children are inadmissible unless they are either (1) uttered spontaneously and excitedly, or (2) made in response to "open-ended" questions from a specially trained professional during a videotaped interview and the evidence establishes that the child's memory was not "confabulated" by previous improper interviews. To my knowledge no court, state or federal, has ever held that the majority opinion's proposed standards are required by the sixth amendment confrontation clause. The opinion cites no case, federal or state, which has adopted such a severely limited application of the *federal* confrontation clause "indicia of reliability" test. Certainly the most recent decisions of the United States Supreme Court have not imposed the above requirements set out in the majority opinion. *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970), and *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980), hold that hearsay is admissible under the confrontation clause if it bears "particularized guarantees of trustworthiness" and "indicia of reliability." But, as those opinions point out, the "particularized guarantees of trustworthiness" and "indicia of reliability" are to be determined from *all* of the facts and circumstances, not just the requirements set forth in the majority opinion. The United States Supreme Court, which is the final arbiter of the interpretation and requirements of the sixth amendment confrontation clause of the United States Constitution, has never suggested that the majority opinion's standards are constitutionally required. In utilizing this restrictive method of analysis, the opinion errs seriously and essentially ignores the "indicia of reliability

**2.** The author has determined that the conclusion he reached in his separate opinion in *Giles*

with regard to the harmfulness of the admission of Dr. Jambura's testimony was incorrect.

test" set forth by the United States Supreme Court.

While the majority opinion concludes that the hearsay evidence of Dr. Jambura was erroneously admitted because it violates the confrontation clause of the sixth amendment of the United States Constitution, much of the analysis sounds as though the opinion was based upon state evidentiary law. Thus, by placing emphasis on whether a child abuse victim's statement to a professional was "excited," the majority opinion highlights hearsay exception I.R.E. 803(2) to the exclusion of other hearsay exceptions, particularly I.R.E. 803(24) which requires the same circumstantial guarantees of truthfulness equivalent to the excited utterance exception. The opinion seems to wrongly conclude that a child's words are only reliable when uttered excitedly. However, as this Court pointed out in *State v. Hester*, when comparing the other exceptions to the hearsay rule to the excited utterance exception in I.R.E. 803(2), "Once these elements [the elements of trustworthiness required under I.R.E. 803(24) ] are met, the I.R.E. 803(24) exception is equally as valid as any other hearsay exception, such as the universally accepted present sense impression *and the excited utterance exceptions*, etc." *State v. Hester*, 114 Idaho at 697, 760 P.2d at 36 (1988) (emphasis added).

Under the majority's new standards for its confrontation clause analysis, evidence which would otherwise satisfy the "trustworthiness" and "indicia of reliability" standard established by the United States Supreme Court, especially corroborating physical and medical evidence, appears to become irrelevant. Excited utterances seem to be the only constitutionally accepted type of hearsay which is admissible, short of complying with the new standards which, as a practical matter, can never be met.

A child's report of sexual abuse is not always spoken excitedly, and it is not always directed at a professional specifically trained in interviewing child victim's of sexual abuse, as the majority now seems to require. A professional, such as a family pediatrician, may observe evidence of sexual abuse while conducting a routine examination of a young patient. The doctor may question the youngster and receive important hearsay evidence. Under the law pronounced today, this evidence will be inadmissible unless the doctor was trained specifically to interview child victims of sexual abuse and asked no "closed-ended" questions. Furthermore, it is highly unlikely that the interview would have been videotaped. Family doctors do not normally film their examinations of young patients; most probably do not have video cameras in their examining rooms. Furthermore, many rural communities do not have the financial means to set up extensive videotape facilities to aid in the preparation of criminal cases. Until today, there were no such requirements under either state or federal law.

The majority opinion also makes an erroneous application of the facts of the case to its new confrontation clause standard. For instance, the opinion's discussion implies that the younger daughter's statements came after her memory was "confabulated" by previous improper interviews. On the contrary, Dr. Jambura was the *first* interviewer. Therefore, the record does not support a finding that the younger daughter's statement to Dr. Jambura was affected by prior memory confabulation or improper tainting.

The majority's opinion further concludes that, "The [child's] statements lack trustworthiness because this interrogation was performed by someone with a preconceived idea of what the child should be disclosing." 116 Idaho at 385, 775 P.2d at 1227. This statement suggests that the Court is setting an additional standard, which requires that the interrogation be performed by someone who has no idea what the child will be disclosing. In the usual case the specially trained professional will be advised of the purpose of the physical examination, either by the parents or by the authorities, and thus will have "a preconceived idea of what the child should be disclosing," which the majority opinion says disqualifies him from testifying. This case is such an example. The day before

Dr. Jambura examined the 2½ year old girl, he had also examined her 5 year old sister and uncovered evidence of sexual abuse on the older girl. He was also informed of the older sister's statement to law enforcement and medical personnel explaining how she and her sister had been sexually abused by Wright and Giles. He also knew that the younger daughter had just been taken away from her parents and put into protective custody. To automatically disqualify an interviewer because he has "a preconceived idea of what the child should be disclosing" will, in all probability, eliminate the use of nearly *all* statements made by young children to medical doctors, psychologists or social workers. That result is certainly not required by the confrontation clause of the sixth amendment of the United States Constitution, according to the decisions of the United States Supreme Court. *Ohio v. Roberts*, 448 U.S. 56, 100 S.Ct. 2531, 65 L.Ed.2d 597 (1980); *California v. Green*, 399 U.S. 149, 90 S.Ct. 1930, 26 L.Ed.2d 489 (1970). And it certainly is not required under the evidentiary laws of the State of Idaho, as our recent cases have held. *State v. Giles*, 115 Idaho 984, 772 P.2d 191 (1989); *State v. Hester*, 114 Idaho 688, 760 P.2d 17 (1988).

I would affirm the judgment and sentence of the district court for the same reasons set out in our opinion dealing with the co-defendant Giles in *State v. Giles, supra.*