**UNITED STATES of America, Plaintiff–Appellee,**

v.

**William T. CANAN, Defendant–Appellant.**

No. 94–5088.

United States Court of Appeals, Sixth Circuit.

Argued Oct. 7, 1994.

Decided March 3, 1995.

Mark A. Wohlander, Asst. U.S. Atty., Lexington, KY (argued and briefed), for plaintiff-appellee.

James A. Shuffett, Lexington, KY (argued and briefed), for defendant-appellant.

Before: MARTIN, NELSON, and NORRIS, Circuit Judges.

MARTIN, J., announced the judgment of the court and delivered an opinion, in which NELSON and NORRIS, JJ., concurred except as to Part IV B. NELSON, J. (pp. 963–965), delivered a separate opinion with respect to the issue addressed in Part IV B. NORRIS, J., having concurred in the separate opinion, that opinion constitutes the opinion of the court on the Part IV B issue.

BOYCE F. MARTIN, JR., Circuit Judge.

A jury convicted William T. Canan, a private investigator and former police officer, of conspiring to possess and distribute cocaine, possessing and distributing cocaine, intimidating two grand jury witnesses, and possessing an unlawfully-produced DEA identification card. Claiming that the warrant authorizing the search of his residence was not supported by probable cause, Canan argues that the district court erred in denying his suppression motion. In addition, he contends that the admission of a witness's videotaped statement as evidence violated the provisions of Fed.R.Evid. 804(b)(5) as well as his Sixth Amendment right of confrontation. He also asserts that the district court should have granted his motion for judgment of acquittal on the possession and distribution of cocaine count and the possession of false DEA credentials count, challenging the sufficiency of the evidence used to convict him of those charges. Further, he claims that the witness intimidation counts listed in the Indictment were defective for failure to charge an offense. Finally, Canan contests the two-level sentencing enhancement imposed by the district court for firearm possession.

## I.

In early 1988, Canan became involved in a cocaine distribution ring established by Susan Griffin, a deputy court clerk in Fayette County, Kentucky, and Donald Kimbler, a Florida private investigator. Kimbler supplied the drugs; Griffin and Canan sold them. Because Griffin served as an intermediary between Kimbler and Canan, delivering the drugs and proceeds from one to the other, the distribution scheme had been underway for several months before the two actually met. According to Griffin, she formally introduced Kimbler and Canan sometime in 1988, in the wake of a dispute between them over the quality of a cocaine supply.

After he received a drug supply from Griffin, Canan, in turn, would distribute various quantities to other individuals, including Robert Scott and George Umstead. According to Scott, who characterized his drug transactions with Canan as "pretty regular," he dealt with Canan in 1988, 1989, and 1990. These transactions allegedly took place in restaurants, motels, and even Scott's home. Although Scott initially paid for the cocaine upon delivery, Canan soon began to "front" the drugs to Scott and establish payment deadlines. According to Scott, one of Canan's sources was "an older fellow that lived in Florida." When "this guy" came into town in December 1989, Scott and Canan engaged in two separate drug transactions. They eventually curtailed their drug business, however, prompted in part by the 1990 arrest of this Florida source. Scott estimated that during the course of their involvement, he received between four and six kilograms of cocaine from Canan.

Canan began distributing cocaine to Umstead, a former co-worker at the Lexington, Kentucky Police Department, in the spring of 1988. On that first occasion, Canan allegedly fronted approximately sixteen ounces of cocaine to Umstead. Another transaction,

which took place in the summer of 1988, was for eighteen or twenty ounces. According to Umstead, he and Canan also engaged in a thirty-four ounce transaction at some point, although he could not recall the specifics of that deal. When soliciting Umstead's participation in his drug distribution scheme, Canan had indicated that his supplier was a federal agent from Florida. Umstead estimated that, in total, he received approximately two kilograms of cocaine from Canan.

In 1991, Scott was arrested on drug-related charges and immediately began cooperating with authorities. During the year following Scott's arrest, Canan repeatedly threatened him. On one occasion, Canan allegedly broke into Scott's house and informed Scott that he did not fear death and that he was not scared of Scott or Umstead. Knowing that Scott's wife and children were home at the time, Canan observed that "[o]ne good thing about bombs is, you can be gone three or four days before they go off, and the bad thing about them is, is that sometimes innocent women and children get hurt in the process." According to Scott, Canan also forced him to prepare a tape recording in which he stated that neither Scott, Umstead, nor Canan were involved in the cocaine distribution scheme. Canan allegedly continued to intimidate Scott until Scott fled Kentucky the day before his own sentencing.

Umstead began cooperating with law enforcement officers in early 1991, shortly after he learned that he would be indicted on drug conspiracy charges. Upon hearing that Umstead had been approached by authorities, Canan contacted him to ascertain the details of their meeting. Within the next few weeks, Canan went to Umstead's residence. After Umstead admitted to Canan that he intended to cooperate with the investigation, a "very irate" Canan warned him that "[f]amilies have a way of being hurt, people have a way of disappearing."

Canan's activities first came to the attention of the FBI in February 1991. When alerted that Kimbler, then in police custody in Roanoke, Virginia, had information about drug trafficking in Lexington, Special Agent William Welsh traveled to Virginia to meet with him. As part of the ensuing investiga-

tion, Welsh obtained hotel receipts, airline tickets, and telephone records to verify the scope of the drug distribution ring as well as the identity of its participants. The information served to link Kimbler, Griffin, and Canan. From these records, for instance, Welsh matched up telephone calls between them during the dates mentioned in the indictment.

Believing that Canan continued to maintain "records, transcripts, notes and other items," Welsh obtained a warrant to search his residence on April 9, 1993. In his supporting affidavit, Welsh stated that he had interviewed a cooperating witness (Griffin) in March 1993, who indicated that beginning in March 1988, she participated in a drug distribution scheme with Kimbler and Canan. According to Welsh, Griffin also indicated that she and Canan dealt with Kimbler on a regular basis. Apparently Griffin usually received the cocaine from Kimbler and brought it to Canan's apartment, which she last visited in 1989. Griffin allegedly informed Welsh that she contacted Canan in February 1993, after learning that she was under investigation for her drug distribution activities. During their conversation, Canan apparently asked Griffin for some cocaine. Welsh also stated in the affidavit that a second cooperating witness, Robert Scott, admitted that Canan had threatened to kill him after learning that he intended to cooperate with authorities.

During the resulting search, authorities recovered calendars and diaries, an address/telephone number book, a loaded gun, scales, xerox copies of credentials for a Special Agent of the DEA, a copy of an affidavit from Scott, a three-volume set of books entitled *How to Kill*, a book entitled the *Anarchist Cookbook*, two pamphlets on explosives, various photographs of weapons and ammunition, a plate containing a white substance, a plastic bag containing a white substance, packages of one-hundred dollar bills, handcuffs, and a badge. Canan was then arrested. A search conducted incident to the arrest revealed that he was armed at the time of arrest.

## II.

On July 15, 1993, a federal grand jury in Lexington, Kentucky returned a six-count superseding indictment charging Canan with conspiring to distribute and to possess with intent to distribute approximately five kilograms of cocaine in violation of 21 U.S.C. § 846; distributing and possessing with intent to distribute approximately eighteen ounces of cocaine in violation of 21 U.S.C. § 841(a)(1); using firearms during and in relation to a drug trafficking offense in violation of 18 U.S.C. § 924(c)(1); using intimidation to persuade an individual to withhold testimony from the grand jury in violation of 18 U.S.C. § 1512(b)(2)(A), and knowingly possessing a United States identification document produced without lawful authority in violation of 18 U.S.C. § 1028(a)(6). A second superseding indictment charging Canan with two counts of possessing unregistered firearms in violation of 26 U.S.C. §§ 5861(d) and 5871 was later dismissed.

Prior to trial, Canan filed a motion to suppress the evidence seized during the April 9 search of his residence, alleging a violation of his Fourth Amendment rights. Specifically, he contended that the affidavit accompanying the search warrant was based upon "stale" information. The district court denied this motion, ruling that the events described in the affidavit were "ongoing" in nature. The court also reasoned that in any event, recent information corroborated any "otherwise stale" information, citing *United States v. Henson,* 848 F.2d 1374, 1381–82 (6th Cir.1988), *cert. denied,* 488 U.S. 1005, 109 S.Ct. 784, 102 L.Ed.2d 776 (1989).

In addition, the United States filed a notice of its intent to offer a videotaped statement of a deceased witness, Kimbler, pursuant to Fed.R.Evid. 804. The United States had questioned Kimbler, under oath, on May 13, 1993. Canan was present during the interrogation, although his attorney was not, and Kimbler died soon after making the statement. The district court admitted this statement into evidence, determining that the total circumstances existing at the time Kimbler made the statement "render Kimbler particularly worthy of belief." The court further specified:

[O]ne, he testified under oath in response to questions by counsel for the United States, knowing that his testimony would be preserved on videotape; secondly, he had firsthand knowledge of the subject of his testimony; third, he agreed to be truthful in his testimony, and never recanted; and, lastly, Mr. Canan was present during the testimony, thus making fabrication difficult.

On October 21, the jury acquitted Canan of the weapons charge, but found him guilty on the remaining five counts. On January 14, 1994, the district court sentenced Canan to a seventeen year, eight month term of imprisonment, followed by a five year period of supervised release. Notwithstanding the fact that Canan was acquitted of the weapons charge, the district court added a two-level enhancement to Canan's base offense level pursuant to U.S.S.G. § 2D1.1(b)(1), for possessing a gun during the commission of an offense. This timely appeal followed.

## III.

First, Canan argues that the district court erred in denying his motion to suppress evidence, claiming that the affidavit in support of the warrant to search his residence was based upon "stale" data. Specifically, he argues that the affidavit does not describe any conduct connected with a criminal offense occurring at his residence within the last four years. The United States, on the other hand, agrees with the district court's characterization of the criminal activity as "ongoing," maintaining that the recent corroboration updates any otherwise stale information.

In determining whether a search warrant is supported by probable cause, a magistrate must employ a flexible, totality of the circumstances standard. *Illinois v. Gates,* 462 U.S. 213, 233, 103 S.Ct. 2317, 2329, 76 L.Ed.2d 527 (1983). A reviewing court, in turn, must merely "determine whether there is substantial evidence in the record supporting the magistrate's decision to issue the warrant." *Massachusetts v. Upton,* 466 U.S. 727, 728, 104 S.Ct. 2085, 2085, 80 L.Ed.2d 721 (1984). Here, we believe that

the magistrate had "a substantial basis for concluding that a search would uncover evidence of wrongdoing." *United States v. Leake,* 998 F.2d 1359, 1363 (6th Cir.1993) (citation omitted). As this Court recognized in *Henson,* "the function of a staleness test in the search warrant context is not to create an arbitrary time limitation within which discovered facts must be presented to a magistrate." *Henson,* 848 F.2d at 1382 (quoting *United States v. Haimowitz,* 706 F.2d 1549, 1554–55 (11th Cir.1983) (citation omitted), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984)). Rather, the existence of probable cause is a function of "the inherent nature of the crime." *Id.* "[I]f an affidavit recites activity indicating protracted or continuous conduct, time is of less significance." *Id.* (quoting *Haimowitz,* 706 F.2d at 1554–55). Moreover, although a significant period of time may have elapsed since a defendant's last reported criminal activity, it may be properly inferred that indicia of criminal activity will be kept for some period of time. *E.g., United States v. Greany,* 929 F.2d 523, 525 (9th Cir.1991) (citations omitted); *United States v. Craig,* 861 F.2d 818, 822 (5th Cir.1988) (citations omitted).

■ Even if this search warrant was issued without the requisite showing of probable cause, however, the searching officers relied on the warrant's validity in good faith. *United States v. Leon,* 468 U.S. 897, 104 S.Ct. 3405, 82 L.Ed.2d 677 (1984). In *Leon,* the Supreme Court modified the exclusionary rule "so as not to bar the admission of evidence seized in reasonable, good-faith reliance on a search warrant that is subsequently held to be defective." *Id.* at 905, 104 S.Ct. at 3411. Because the affidavit filed in support of the warrant in this case was not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable," *United States v. Savoca,* 761 F.2d 292, 296 (6th Cir.) (quoting *Brown v. Illinois,* 422 U.S. 590, 611, 95 S.Ct. 2254, 2265, 45 L.Ed.2d 416 (1975) (Powell, J., concurring in part)), *cert. denied,* 474 U.S. 852, 106 S.Ct. 153, 88 L.Ed.2d 126 (1985), it falls within the good faith exception.

## IV.

### A.

Canan also claims that the district court's admission of Kimbler's statement under Fed. R.Evid. 804(b)(5), the residual hearsay exception, violated the Confrontation Clause. Rule 804(b)(5) authorizes the admission of a hearsay statement not covered by any specific exception to the general prohibition, "but having equivalent circumstantial guarantees of trustworthiness," provided: [1] it is evidence of a material fact; [2] it is the most probative evidence that the proponent could reasonably obtain; and [3] its admission furthers the general purposes of the Federal Rules of Evidence as well as the interests of justice. However, the Confrontation Clause, which establishes a criminal defendant's right "to be confronted with the witnesses against him," U.S. Const. amend. VI, may place independent restrictions upon the admission of such evidence. *Curro v. United States,* 4 F.3d 436, 437 (6th Cir.1993).

■ After the parties filed their respective briefs in this case, *Williamson v. United States,* ─── U.S. ───, 114 S.Ct. 2431, 129 L.Ed.2d 476 (1994), was decided, clarifying the scope of the hearsay exception for statements against penal interest under Fed. R.Evid. 804(b)(3). Using the broad definition of "statement" articulated in Fed. R.Evid. 801(a)(1)—"an oral or written assertion"—as a point of departure, *Williamson* went on to explain the significance of the term for purposes of Rule 804(b)(3). *Id.* at ───, 114 S.Ct. at 2434. Specifically, the Court concluded that the word "statement" means "a single declaration or remark," rather than a "report or narrative," reasoning that this "narrower reading" is consistent with the principle underlying Rule 804(b)(3). *Id.* at ─── ─ ───, 114 S.Ct. at 2434–35. Thus, when ruling upon a narrative's admissibility under this rule, a court must break it down and determine the separate admissibility of each "single declaration or remark." This exercise is "a fact-intensive inquiry" that requires "careful examination of all the circumstances surrounding the criminal activity involved." *Id.* at ───, 114 S.Ct. at 2437. In *Williamson,* because the court be-

low failed to conduct the appropriate analysis, the Court remanded the case without reaching the issue of whether the confrontation clause rendered the statements at issue inadmissible. *Id.*

Although *Williamson* defined the term "statement" as it applies in the context of Rule 804(b)(3) "statements against interest," we think that its definition extends to the other hearsay exceptions delineated in Rule 804 as well. Accordingly, the term "statement" must mean "a single declaration or remark" for purposes of all of the hearsay rules. This determination is consistent with the idea implicit in Rule 801(a): that there is an overarching and uniform definition of "statement" applicable under all of the hearsay rules. Rule 801(a) indicates that its definition of statement covers Article VIII (Hearsay) of the Federal Rules of Evidence, entirely. It would make little sense for the same defined term to have disparate meanings throughout the various subdivisions of the hearsay rules.

 Because the term "statement" also signifies "a single declaration or remark" for purposes of Rule 804(b)(5), a court, when determining the admissibility of a narrative, must examine it sentence by sentence and rule upon the admissibility of each "single declaration or remark." In this context, however, the appropriate inquiry is not whether each "single declaration or remark" is "truly self-inculpatory," *id.*, as with Rule 804(b)(3); rather, each "single declaration or remark" must meet the requirements set out in Rule 804(b)(5). Thus, it must first have "particularized guarantees of trustworthiness." *Curro*, 4 F.3d at 437 (citing *Ohio v. Roberts*, 448 U.S. 56, 66, 100 S.Ct. 2531, 2539, 65 L.Ed.2d 597 (1980)). Whether a statement possesses the requisite "indicia of trustworthiness," *id.*, depends upon the circumstances "that surround the making of the hearsay statement and that render the declarant particularly worthy of belief." *United States v. Gomez–Lemos*, 939 F.2d 326, 332 (6th Cir.1991) (quoting *Idaho v. Wright*, 497 U.S. 805, 819, 110 S.Ct. 3139, 3148, 111 L.Ed.2d 638 (1990)). In addition, the statement must relate to a material fact; it must be the most probative evidence reasonably available; and its admission must further the purposes of the Federal Rules of Evidence and the interests of justice. Fed.R.Evid. 804(b)(5).

Here, the district court did not analyze the independent statements comprising Kimbler's narrative. Rather, it assessed his entire confession in the aggregate, ultimately concluding that it was admissible under Rule 804(b)(5), because "the total circumstances existing at the time Kimbler made his statement render Kimbler particularly worthy of belief." In reaching this conclusion, the court specifically noted that Kimbler "testified under oath in response to questions by counsel for the United States, knowing that his testimony would be preserved on videotape," that he possessed "firsthand knowledge of the subject of his testimony[,]" that "he agreed to be truthful in his testimony and never recanted," and that Canan's presence during the videotaping made fabrication difficult. Given the context in which the challenged statement was made, these findings demonstrate that the court conducted the required fact-intensive inquiry. *Williamson*, —— U.S. at ——, 114 S.Ct. at 2437. Here, in contrast to *Williamson*, the existing record is sufficient to enable us to evaluate the assertions comprising Kimbler's statement. The circumstances surrounding the making of each individual assertion within Kimbler's narrative are virtually identical. Therefore, remand is not required.

### B.

Accordingly, we must decide whether the admission into evidence of Kimbler's videotaped statement, under Fed.R.Evid. 804(b)(5), violated Canan's right "to be confronted with the witnesses against him." U.S. Const. amend. VI. In essence, the Confrontation Clause provides a criminal defendant with two distinct forms of protection: "the right physically to face those who testify against him and the right to conduct cross-examination." *Carter v. Sowders*, 5 F.3d 975, 977–78 (6th Cir.1993) (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 51, 107 S.Ct. 989, 998, 94 L.Ed.2d 40 (1987)), *cert. denied*, —— U.S.——, 114 S.Ct. 1867, 128 L.Ed.2d 487 (1994). Both are critical, *id.* at 978, and are

"deeply rooted in our legal culture." *Gomez–Lemos,* 939 F.2d at 329 (citing *Coy v. Iowa,* 487 U.S. 1012, 1015–16, 108 S.Ct. 2798, 2800–01, 101 L.Ed.2d 857 (1988)). In fact, this dual guarantee—the right to confront and cross-examine—"is an essential and fundamental requirement for the kind of fair trial which is this country's constitutional goal." *Id.* (quoting *Pointer v. Texas,* 380 U.S. 400, 405, 85 S.Ct. 1065, 1068, 13 L.Ed.2d 923 (1965)).

Hearsay statements admitted under Fed. R.Evid. 804(b)(5), the residual exception, are "presumptively unreliable," *Idaho v. Wright,* 497 U.S. at 818, 110 S.Ct. at 3148 (quoting *Lee v. Illinois,* 476 U.S. 530, 543, 106 S.Ct. 2056, 2063, 90 L.Ed.2d 514 (1986)), and violate the Confrontation Clause "absent a showing of particularized guarantees of trustworthiness." *Id.* (quoting *Roberts,* 448 U.S. at 66, 100 S.Ct. at 2539). Specifically, these indicia must establish that the challenged evidence is "so trustworthy that adversarial testing would add little to its reliability." *Id.* at 821 (citations omitted). Furthermore, "unless an affirmative reason, arising from the circumstances in which the statement was made, provides a basis for rebutting the presumption that a hearsay statement is not worthy of reliance at trial, the Confrontation Clause requires exclusion of the out-of-court statement." *Id.*

Canan thus argues that because the requisite "particularized guarantees of trustworthiness" are lacking, the admission of Kimbler's videotaped statement violates the Confrontation Clause. I agree. In its haste, the majority ignores the clear direction of *Idaho v. Wright,* 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 and turns the Constitution on its head. In my mind, the Sixth Amendment right of confrontation is absolute. The Constitution should not be degraded in the name of expediency. In most cases, cross-examination can determine, to some extent, the truth or falsity of a declarant's statement. Thus, a court's assessment of whether a particular declarant is apt to lie must not infringe upon an innocent's right to receive a fair trial in which the opportunity to cross-examination is preserved.

In *Carter,* 5 F.3d at 979, this Court recently observed that the absence of a criminal defendant's counsel during a pre-trial deposition requires "close scrutiny." We elaborated further:

> [I]f counsel entirely fails to subject the prosecution's case to meaningful adversarial testing, then there has been a denial of Sixth Amendment rights that makes the adversary process itself presumptively unreliable.... The Court has uniformly found constitutional error without any showing of prejudice when counsel was either totally absent, or prevented from assisting the accused during a critical stage of the proceeding.

*Id.* (quoting *United States v. Cronic,* 466 U.S. 648, 659, 104 S.Ct. 2039, 2047, 80 L.Ed.2d 657 (1984)). Highlighting the inherent unreliability of an uncross-examined, videotaped statement, this Court concluded that its admission into evidence at trial constituted a Confrontation Clause violation. *Id.*

Here, as in *Carter,* the "circumstances could not provide the trier of fact with a 'satisfactory basis for evaluating the truth of the prior statement.'" *Id.* at 980 (quoting *Dutton v. Evans,* 400 U.S. 74, 89, 91 S.Ct. 210, 220, 27 L.Ed.2d 213 (1970)). Importantly, Kimbler was not subject to cross-examination at the time he made his videotaped statement; Canan's attorney was not even present during the proceedings; and Canan himself was not offered a chance to interrogate the witness. I do not agree with the district court's conclusion that Canan's presence alone "made fabrication difficult," and thus ensured the reliability of Kimbler's statement. Kimbler did not make the challenged statement at a formal proceeding; due to the absence of Canan's attorney and the lack of cross-examination, Kimbler's statement did not qualify as a deposition. Moreover, the questions were posed in such a fashion as to elicit damaging statements regarding Canan. In addition, as the district court observed, Kimbler "was in a grave condition at the time he gave this statement" and "must have realized that he would soon die." Rather than destroying any potential motive to craft his statement in order to

curry favor with the government, as the district court found, however, Kimbler's condition may actually have diminished his truth-telling incentive—if Kimbler knew that he was approaching death, then he also knew that any threats of future prosecution were hollow. In my mind, then, the hearsay that the majority now admits lacks credibility. To deny Canan counsel and to deny him even the opportunity to cross-examine Kimbler himself renders the expediency made possible by modern technology totally repugnant to the Confrontation Clause. Under the loose reading that the majority has given the Constitution, trials can now be held with no one necessarily being present except the defendant. While modern technology has improved our life tremendously, the steps the majority takes here are, to me, steps backward.

Thus, I conclude that admission of Kimbler's videotaped statement violated the Confrontation Clause. Because I also conclude that this error was not harmless beyond a reasonable doubt, I would grant Canan a new trial. My colleagues on the panel have decided not to require a new trial, and for the reasons stated above, I dissent from that decision.

## V.

■ In addition, Canan claims that his motion for judgment of acquittal should have been granted with respect to the possession and distribution of cocaine charge as well as the possession of false credentials charge. Although we review the district court's denial of the motion *de novo,* we must affirm its decision if the evidence, viewed in the light most favorable to the government, would allow a rational trier of fact to find the defendant guilty beyond a reasonable doubt. *United States v. Montgomery,* 980 F.2d 388, 393 (6th Cir.1992). Concerning the drug-related charge, Canan argues that a judgment of acquittal was required due to a variance between the indictment and the proof adduced at trial. Specifically, he contends that contrary to the assertions in the indictment, the record does not indicate that between December 27, 1989 and January 2, 1990, he possessed or distributed eighteen

ounces of cocaine in Fayette County, Kentucky. However, this claim is not borne out by the facts. At trial, Scott testified that he received approximately eight ounces of cocaine from Canan in December 1989, "around Christmastime." He also testified that he received another six to eight ounces from Canan "a couple of days later." Moreover, Kimbler's records indicated that he sold seventeen units of cocaine within the time frame of the indictment, and Canan's own records corroborated the transactions with Kimbler. The variance between "approximately eighteen ounces" charged in the indictment, and sixteen or seventeen ounces, is not so great as to require acquittal.

■ Canan also argues that his motion for judgment of acquittal should have been granted with respect to the false credentials charge. He claims the credentials he possessed identified him as an employee of a long-defunct law enforcement agency rather than an existing body, and that therefore, his conduct was not covered by 18 U.S.C. § 1028(a)(6). That section makes it illegal to possess "an identification document that is or appears to be an identification document of the United States which is stolen or produced without lawful authority knowing such document was stolen or produced without such authority ..." Canan interprets Section 1028(a)(6) to require the possession of a document that is or purports to be the identification of an existing agency. Even if his reading of the statute is correct, however, the record indicates that although the identification document was contained in a leather cover bearing a defunct agency's seal, the credentials themselves appeared to be those of a legitimate, existing law enforcement body—the DEA.

## VI.

■ Additionally, Canan argues that the witness intimidation counts listed in the Indictment were defective because they did not sufficiently track statutory language of 18 U.S.C. § 1512(b). We review this issue *de novo. United States v. Superior Growers Supply, Inc.,* 982 F.2d 173, 177 (6th Cir. 1992). The challenged portions of the indictment alleged that Canan "did knowingly use

intimidation, threatened and corruptly persuaded [the witness], and attempted to do so with intent to cause and induce [the witness] to withhold testimony from an official proceeding . . . ." Section 1512(b), in turn, provides:

> Whoever knowingly uses intimidation or physical force, threatens, or corruptly persuades another person, or attempts to do so, or engages in misleading conduct toward another person with intent to . . . cause or induce any person to . . . withhold testimony

. . . . .

18 U.S.C. § 1512(b). We find that the indictment fully captures the statute's intent requirement. *See United States v. Murph*, 707 F.2d 895, 896 (6th Cir.) (observing that it is "settled law" that an offense may be charged conjunctively in an indictment where the statute states the offense disjunctively), *cert. denied*, 464 U.S. 844, 104 S.Ct. 145, 78 L.Ed.2d 136 (1983). We also find no error in the district court's calculation of the guideline sentencing range.

For the foregoing reasons, and for the reasons stated in the separate opinion of Judge Nelson, we affirm the defendant's conviction and sentence.

DAVID A. NELSON, Circuit Judge, concurring in the court's judgment and in all but Part IV B of Judge Martin's opinion.

 Under the test applied by the Supreme Court in *Idaho v. Wright*, 497 U.S. 805, 110 S.Ct. 3139, 111 L.Ed.2d 638 (1990), it does not seem to me that the defendant's right of confrontation was violated by the use made at trial of the videotaped statement given by Donald Kimbler, under oath and in the presence of the defendant, 15 days before Kimbler died of cancer. Accordingly, and because I am satisfied that none of the defendant's remaining assignments of error is meritorious, I would affirm both the conviction and the sentence.

The government acknowledges that the videotaped statement does not come within one of the firmly rooted exceptions to the hearsay rule. That being so, *Idaho v. Wright* teaches that the statement could not be used at trial unless "particularized guarantees of trustworthiness" are found in "the totality of the circumstances . . . that surround the making of the statement. . . ." *Id.* at 820, 110 S.Ct. at 3149. The trial court (Forester, J.) found that the totality of the circumstances did provide the necessary guarantees of trustworthiness. I cannot say that this finding represents an abuse of discretion.

The record indicates that the declarant, Donald Kimbler, had spent over 15 years as an agent of the Treasury Department's Bureau of Alcohol, Tobacco and Firearms. At some point, however, he had become a dealer in cocaine. He kept a written log concerning his drug sales, and the government wanted to take his deposition to have him explain what the log entries meant. Kimbler had previously testified about the log at a federal court proceeding in Virginia, where he had been subject to cross-examination, and the government (which had given him an informal promise of immunity from prosecution) hoped to elicit similar testimony in this case.

Kimbler's doctor had told him he probably had no more than two weeks to live. His physical condition was so precarious that the government told him that he did not have to give his deposition if he did not wish to. Kimbler's wife, a nurse, advised him against testifying, but he told her and others that he wanted to set the record straight before he died. The decision to tell what he knew and what his drug records meant was a purely voluntary decision on Kimbler's part, taken in light of the knowledge that his days on earth were numbered.

If Kimbler had not been quite so close to death's door, his deposition would have gone forward with both the defendant's lawyer and the defendant in attendance. The deposition was scheduled to be held in Florida on May 11, 1993, and the government flew the defendant's lawyer to Florida so that he could cross-examine the witness. Kimbler was taken to the hospital on May 10 to have fluid drained from his abdominal cavity, however, and he was unable to testify on either May 11 or May 12. The defendant's lawyer left Florida on the evening of the 12th, although the defendant himself remained be-

hind, and Kimbler gave his statement the next day. Before the month was out, Kimbler was dead.

When Kimbler made the decision to testify, he had no reason to believe that he would not be cross-examined. Neither did he have any apparent motive to be less than totally candid. His decision to proceed with the deposition when he did not have to, when he had no motive to lie, and when he must have assumed that the defendant and his lawyer would be present, obviously suggests that he was planning to tell the truth.

An additional indicium of the truthfulness of Kimbler's statement may be found in the circumstance that the statement proved to be consistent with the testimony Kimbler had given in the Virginia case. A similar circumstance was cited by this court in *Curro v. United States,* 4 F.3d 436, 437 (6th Cir.1993), as supporting the trial court's decision to admit the evidence at issue there. Kimbler's prior testimony is probably entitled to greater weight than the prior testimony of the declarant in *Curro,* because the *Curro* testimony had been presented in grand jury proceedings where there was no opportunity for cross-examination. Kimbler, by contrast, had been subject to cross-examination when he testified in the Virginia proceeding.

I also attach some significance to the circumstance that Kimbler knew he was being videotaped as he responded to the questions posed by the prosecutor. He thus knew that the jury would be able to observe something of his demeanor. Standing alone, this fact—like the fact that the declarant was under oath—cannot compensate for the absence of cross-examination. See *Carter v. Sowders,* 5 F.3d 975 (6th Cir.1993), where we held that a habeas petitioner's right of confrontation had been violated by the use at his criminal trial of a videotaped deposition given by his accuser outside the presence of the petitioner and the petitioner's lawyer. Among the benefits of confrontation, however, in addition to making the witness submit to cross-examination, are (1) assurance "that the witness will give his statements under oath—thus impressing him with the seriousness of the matter and guarding against the lie by the possibility of a penalty for perjury," and (2) the fact that

confrontation "permits the jury that is to decide the defendant's fate to observe the demeanor of the witness in making his statement, thus aiding the jury in assessing his credibility." *California v. Green,* 399 U.S. 149, 158, 90 S.Ct. 1930, 1935, 26 L.Ed.2d 489 (1970); see also *United States v. Gomez-Lemos,* 939 F.2d 326, 329 (6th Cir.1991) (quoting *Green*).

The Supreme Court of Idaho, in the decision affirmed by the United States Supreme Court in *Idaho v. Wright,* had disallowed use of the interview at issue there because, among other things, "the questions and answers were not recorded on videotape...." 497 U.S. at 812, 110 S.Ct. at 3145, quoting *State v. Wright,* 116 Idaho 382, 385, 775 P.2d 1224, 1227 (1989). The Supreme Court of the United States declined to give "dispositive weight" to the lack of such procedural safeguards as videotaping, and presumably the Court would not have considered their presence dispositive either if such safeguards had been employed in *Wright.* Clearly, however, the videotaping, like the oath, is a circumstance that must be taken into account when we weigh the totality of the circumstances under which the statement was given.

The principal element that distinguishes the instant case from *Carter v. Sowders,* aside from the facts that here the accused was present when the statement was given and here the statement was consistent with prior testimony presented by the declarant, is the fact that Kimbler gave his statement knowing he would soon be dead. It is true that this meant the government would not be able to prosecute him for perjury if he lied, but it is equally true that he no longer had any incentive to curry favor with the government. The fact that he knew that he was about to die meant that the government could not give him any meaningful reward for incriminating the defendant. And it is well established that "the sense of impending death is presumed to remove all temptation to falsehood...." *Mattox v. United States,* 156 U.S. 237, 244, 15 S.Ct. 337, 340, 39 L.Ed. 409 (1895); *Idaho v. Wright,* 497 U.S. at 820, 110 S.Ct. at 3149 (quoting *Mattox*).

If it be true that, as Lord Justice Lush observed in a British decision cited with approval in *Idaho v. Wright*, 497 U.S. at 820, 110 S.Ct. at 3149, "no person, who is immediately going into the presence of his Maker, will do so with a lie upon his lips," it is not likely that any person who expects to meet his Maker within the next two weeks would wish to slander another while looking the other in the face. The presence of the defendant might or might not have made fabrication difficult if Kimbler had not been dying, but Kimbler was dying. It is thus reasonable to think that the defendant's being present in person, while Kimbler was being questioned under oath, strengthened the various circumstantial guarantees that Kimbler was telling the truth.

From the earliest days of the Supreme Court's Confrontation Clause jurisprudence, the Court has "consistently held that the Clause does not necessarily prohibit the admission of hearsay statements against a criminal defendant, even though the admission of such statements might be thought to violate the literal terms of the Clause." *Idaho v. Wright*, 497 U.S. at 813, 110 S.Ct. at 3145. The Sixth Amendment right of confrontation is thus not absolute. Perhaps it would be a better world if the literal terms of the Constitution were applied across the board—it would be a very different world, in any event—but the inferior courts established by Congress under Article III of the Constitution were not established to second-guess the Supreme Court. Notwithstanding that cross-examination is, as Wigmore put it, the "greatest legal engine ever invented for the discovery of truth," 5 Wigmore § 1367, as quoted in *California v. Green*, 399 U.S. at 158, 90 S.Ct. at 1935, the Supreme Court has made it very clear that the absence of cross-examination is not fatal to the admissibility of an extra-judicial statement shown, in light of the totality of the circumstances, to carry particularized guarantees of trustworthiness. I believe, as did the trial judge, that Kimbler's statement had such guarantees of trustworthiness, and I would not give defendant Canan a new trial.

I am authorized to state that Judge Norris concurs in this opinion, which constitutes the opinion of the court with respect to this issue.